UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| THE CONFEDERATED TRIBES AND BANDS OF THE YAKAMA NATION, a sovereign federally recognized Native Nation,<br><br>       Plaintiff,<br><br> v.<br><br>KLICKITAT COUNTY, a political subdivision of the State of Washington; KLICKITAT COUNTY SHERIFF'S OFFICE, an agency of Klickitat County; BOB SONGER, in his official capacity; KLICKITAT COUNTY DEPARTMENT OF THE PROSECUTING ATTORNEY, an agency of Klickitat County; and DAVID QUESNEL, in his official capacity,<br><br>      Defendants. | NO. 1:17-CV-3192-TOR<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |

BEFORE THE COURT is Plaintiff's Motion for Preliminary Injunction.

ECF No. 36. This matter was heard with oral argument on February 15, 2019.

ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION ~ 1

The Court has reviewed the record and files therein, and is fully informed.  For the reasons discussed below, Plaintiff's Motion for Preliminary Injunction is **DENIED**.

## BACKGROUND

On November 3, 2017, Plaintiff the Confederated Tribes and Bands of the Yakama Nation filed a Complaint against Defendants Klickitat County, Klickitat County Sherriff's Office, Klickitat's County Sheriff Bob Songer, Klickitat County Department of the Prosecuting Attorney, and Prosecuting Attorney David Quesnel.  ECF No. 1.  Plaintiff alleges a violation of the Treaty of 1855 with the Yakama Nation.  *Id.* at ¶¶ 6.1-6.3.  Plaintiff seeks declaratory relief that Defendants do not have criminal jurisdiction, and that they violated the Yakama Nation's inherent sovereign and Treaty-reserved rights by unlawfully exercising criminal jurisdiction over PTS, an enrolled Yakama member whose alleged crimes occurred in Indian Country.  *Id.* at ¶ 7.  Plaintiff also requests a preliminary and permanent injunction enjoining Defendants from exercising criminal jurisdiction over enrolled Yakama members for actions arising within the Yakama Reservation.  *Id.* at ¶ 7.

On April 2, 2018, Defendants filed a motion to dismiss for failure to state a claim and failure to join indispensable parties.  ECF No. 16.  The Court denied Defendants' motion on June 29, 2018.  ECF No. 25.

On December 11, 2018, Plaintiff filed the instant motion for a preliminary injunction. ECF No. 36. The event triggering Plaintiff's motion was the arrest of a second Yakama member, Mr. Robert Libby, on October 13, 2018, "within the [community] of Glenwood in Tract D." *Id*. at 24. Plaintiff asserts that Defendants are now prosecuting Mr. Libby under State law for alleged crimes arising within the Yakama Reservation. *Id*. at 2. Plaintiff seeks a preliminary injunction enjoining Defendants from exercising criminal jurisdiction "arising from actions within the exterior boundaries of the Yakama Reservation, including Tract D, and involving an Indian as a defendant and/or victim." *Id*. Defendants filed a response to Plaintiff's motion on January 18, 2019. ECF No. 43.

## FACTS

The following facts are drawn from Plaintiff's Complaint and are essentially undisputed as relevant and material to resolution of the instant motion. Under the Treaty of 1855, the Yakama Nation reserved the right to the exclusive use and benefit of the Yakama Reservation. ECF No. 1 at ¶ 5.2. The boundaries were set forth in Article II of the Treaty of 1855 as follows:

> Commencing on the Yakama River, at the mouth of the Attah-nam River; thence westerly along said Attah-nam River to the forks; thence along the southern tributary to the Cascade Mountains; thence southerly along the main ridge of said mountains, passing south and east of Mount Adams, to the spur whence flows the waters of the Klickitat and Pisco rivers; thence down said spur to the divide separating the waters of the Satass River from those flowing into the Columbia River; thence along said divide to the main Yakama, eight

miles below the mouth of the Satass River; and thence up the Yakama
River to the place of beginning.

*Id.* Plaintiff asserts that the exterior boundaries of the Yakama Reservation remain

unchanged since the signing of the Treaty in 1855. *Id.* at ¶ 5.3.

On June 12, 1855, Territorial Governor Isaac Stevens prepared a map of the

Yakama Reservation ("Treaty Map"), and sent the Treaty Map and Treaty of 1855

to Washington D.C. for ratification. *Id.* at ¶ 5.4. The Treaty was ratified on March

8, 1859 and proclaimed by President James Buchanan on April 18, 1859. *Id.* at ¶

5.6. The Treaty Map depicts a tract of land on the southwest corner of the Yakama

Reservation known as "Tract D," which was described as "passing south and east

of Mount Adams, to the spur whence flows the waters of the Klickitat and Pisco

rivers; thence down said spur to the divide separating the waters of the Satass

River from those flowing into the Columbia River ...." *Id.* at ¶ 5.5

Plaintiff states that some confusion arose in the late 19th century and early

part of the 20th century due to the United States' misplacement of the Treaty Map

and subsequent erroneous surveys related to the Yakama Reservation. *Id.* at ¶ 5.7.

Yet, Plaintiff contends that Tract D was wholly included among the lands promised

to the Yakama Nation in the Treaty of 1855, which Defendants deny. *Id.*

On March 13, 1963, the State of Washington assumed partial civil and

criminal jurisdiction from the United States over the Yakama Reservation under

Public Law 83-280.  *Id.* at ¶ 5.10.  Plaintiff emphasizes that the Yakama Nation did not agree to the law and it unsuccessfully challenged it in the United States Supreme Court.  ECF No. 1 at ¶ 5.10; *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463 (1979).

On January 17, 2014, Washington State Governor Jay Inslee issued Proclamation by the Governor 14-01 ("Proclamation 14-01") partially retroceding the State of Washington's jurisdiction over the Yakama Reservation back to the United States.  ECF No. 1 at ¶ 5.11.  In Proclamation 14-01, the State of Washington retroceded to the United States "full civil and criminal jurisdiction" in four areas of law, including "Juvenile Delinquency."  *Id.* at ¶ 5.12.  According to Plaintiff, the State of Washington also retroceded to the United States criminal jurisdiction over all offenses within the exterior boundaries of the Yakama Reservation, subject to limited exceptions.  *Id*.

On October 19, 2015, the United States Department of the Interior ("DOI") accepted the State of Washington's retrocessions of jurisdiction concerning the Yakama Reservation.  *Id.* at ¶ 5.13.  Plaintiff then insists that Klickitat County may no longer exercise any criminal jurisdiction over a minor Yakama member for alleged crimes committed on the Yakama Reservation, as that jurisdiction lies with the Yakama Nation and/or the United States.  *Id.* at ¶ 5.14.

On September 27, 2017, Klickitat County arrested PTS, an enrolled Yakama member and minor, detained PTS at the Northern Oregon Regional Correctional Facility, and charged PTS with two counts of statutory rape. *Id.* at ¶ 5.16. Plaintiff asserts that the alleged crimes occurred within the exterior boundaries of the Yakama Reservation near Glenwood within Tract D. *Id.* at ¶ 5.17. Plaintiff argues that Defendants have acted unlawfully by arresting, detaining, charging, prosecuting, and convicting PTS. *Id.* at ¶ 5.18. Plaintiff also contends that Defendants have acted unlawfully by enforcing State laws within the boundaries of the Yakama Reservation. *Id.* at ¶ 5.19. Plaintiff notes that on April 11, 2016, the Klickitat County Sheriff's Office publicly stated that "we do not consider the town of Glenwood or any portion of Glenwood Valley part of the Reservation," and indicated that he would dispatch "additional deputies" to this area. *Id.*

## DISCUSSION

### I. Preliminary Injunction

Pursuant to Federal Rule of Civil Procedure 65, the Court may grant preliminary injunctive relief in order to prevent "immediate and irreparable injury." Fed. R. Civ. P. 65(b)(1)(A). To obtain this relief, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury in the absence of preliminary relief; (3) that a balancing of the hardships weighs in plaintiff's favor; and (4) that a preliminary injunction will

advance the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012). Under the *Winter* test, a plaintiff must satisfy each element for injunctive relief.

Alternatively, the Ninth Circuit also permits a "sliding scale" approach under which an injunction may be issued if there are "serious questions going to the merits" and "the balance of hardships tips sharply in the plaintiff's favor," assuming the plaintiff also satisfies the two other *Winter* factors. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) ("[A] stronger showing of one element may offset a weaker showing of another."); *see also Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) ("We have also articulated an alternate formulation of the *Winter* test, under which serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." (internal quotation marks and citation omitted)).

The Court construes Plaintiff's Complaint as advancing the following separate but related claims: (1) pursuant to Governor Inslee's retrocession proclamation, the State of Washington "retroceded to the United States criminal jurisdiction over all offenses within the exterior boundaries of the Yakama Reservation"; and (2) pursuant to the Treaty of 1855, the area known as Tract D,

including the unincorporated community of Glenwood, Washington, "is wholly located within the exterior boundaries of the Yakama Reservation." ECF No. 1 at 7, ¶ 5.12; 3, ¶ 1.6. The Court discusses each claim in turn.

## II. Public Law 280

The Court recently rejected Plaintiff's interpretation of the scope of retrocession in *Confederate Tribes and Bands of the Yakama Nation v. City of Toppenish*, a separate case brought by Plaintiff against the City of Toppenish and Yakima County. *See Confederate Tribes and Bands of the Yakama Nation v. City of Toppenish,* 1:18-CV-03190-TOR, ECF No. 28 (Feb. 22, 2019). There, Plaintiff made precisely the same arguments concerning the scope of the State of Washington's retrocession of criminal jurisdiction within the Yakama Reservation as it advances in this case. In short, Plaintiff maintained that Governor Inslee's retrocession proclamation, as accepted by DOI, plainly retroceded criminal jurisdiction over all offenses occurring within the Yakama Reservation whenever Yakama member is involved as either a defendant and/or victim. Based on this interpretation of retrocession, Plaintiff sought a preliminary injunction enjoining Defendants City of Toppenish and Yakima County from exercising criminal jurisdiction within the exterior boundaries of the Yakama Reservation over all offenses where a Yakama member is involved.

The Court rejected Plaintiff's interpretation of the States' retrocession of criminal jurisdiction and denied the motion for a preliminary (and permanent) injunction.  As discussed in this Court's order, the Court viewed the plain language of Governor Inslee's retrocession proclamation, DOI's acceptance of retrocession, and federal and state law governing the retrocession process as properly establishing the limitations of the States' retrocession.  Reading the plain language of the Governor's use of the sentence "The State retains jurisdiction over criminal offenses involving non-Indian defendants and non-Indian victims" in context, both historical and in the context of the entire retrocession proclamation, made clear that the State retained jurisdiction in two areas—over criminal offenses involving non-Indian defendants and over criminal offenses involving non-Indian victims.  Accordingly, the Court found that Plaintiff failed to establish success on the merits of its claims because Defendants City of Toppenish and Yakama County have criminal jurisdiction over offenses committed by or against non-Indians within the Yakama Reservation.

Consistent with this Court's prior ruling in *Confederate Tribes v. City of Toppenish*, the Court again rejects Plaintiff's argument that Defendants no longer have criminal jurisdiction over Indians within the Yakama Reservation following retrocession.  ECF No. 51 at 3.  For the reasons identified in the Court's prior ruling, the Court concludes that following retrocession, the State, and therefore

Defendants, retained criminal jurisdiction over offenses committed by or against non-Indians within the Yakama Reservation. This interpretation of the States' retrocession is consistent with the plain language of the Governor's retrocession proclamation, DOI's acceptance, and federal and state law governing the retrocession process. Accordingly, insofar as Plaintiff argues the State of Washington retroceded criminal jurisdiction over all crimes within the Yakama Reservation where an Indian is involved, the Court finds that Plaintiff cannot succeed on the merits of this claim.

Importantly, the Court's ruling on the retrocession issue is not dispositive of the Tract D issue. Plaintiff's Tract D claim raises important questions about the physical boundaries of the Yakama Reservation, which are unrelated to the Court's interpretation of the Governor's retrocession proclamation. As discussed below, the Tract D issue presents a much closer question on the merits.

III.    **Tract D Boundaries**

This case represents the most recent chapter in a decades-old dispute over the true location of the Yakama Reservation's boundaries. At issue here is an area containing approximately 121,465.69 acres, referred to as Tract D, which Plaintiff claims is within the Yakama Reservation's originally intended boundaries, and which Defendants claim lies outside the Reservation's boundaries. Resolution of

this issue hinges upon the proper location of the Reservation's disputed southwest boundary line.

**A. Likelihood of Success on the Merits**

Plaintiff must show that there are "serious questions going to the merits" of its claim, and that it is likely to succeed on those questions of merit. *Cottrell*, 632 F.3d at 1131; *Farris*, 677 F.3d at 865. Plaintiff claims that Tract D, including the unincorporated community of Glenwood, "is now and always has been part of the Yakama Reservation." ECF No. 36 at 26. To support this claim, Plaintiff argues that (1) the plain language of Article II of the Treaty of 1855 extends the Yakama Reservation's western boundary south of Mount Adams to include Tract D, (2) the Yakama Treaty signers understood the Treaty language to include Tract D within the Yakama Reservation, (3) Territorial Governor Stevens described the southwest boundary of the Yakama Reservation as including Tract D, and (4) the original Treaty Map depicts Tract D as within the Yakama Reservation. ECF No. 36 at 27-28. Plaintiff also notes that the Indian Claims Commission's ("ICC") endorsed this view of the southwestern boundary in 1966 when it concluded that the parties to the Treaty of 1855 intended to include Tract D within the Yakama Reservation. *Id.* at 28; *see Yakima Tribe v. United States*, 16 Ind. Cl. Comm. 553, 563-64 (Feb. 25, 1966).

1  Relying on many of the same historical records cited by Plaintiff but

2  reaching the opposite conclusion, Defendants maintain that the Treaty of 1855

3  excluded Tract D from lying within the exterior boundaries of the Yakama

4  Reservation.  Defendants argue that the language of the Treaty of 1855 does not

5  plainly include Tract D within the Yakama Reservation, subsequent surveys

6  following the Treaty language confirm that Tract D was not included within the

7  Yakama Reservation's boundaries, and the Ninth Circuit and the Supreme Court

8  affirmed a southwest boundary that plainly excluded Tract D from the Yakama

9  Reservation.  ECF No. 43 at 29-30; *see N. Pac. Ry. Co. v. United States*, 191 F.

10  947 (1911), *aff'd*, 227 U.S. 355 (1913).  Defendants proffer testimony of other

11  Yakama Nation leaders, including Chief Spencer and a tribal member by the name

12  of Stick Joe, to contradict Plaintiff's assertion that Yakama Treaty signers

13  understood the Treaty of 1855 to include Tract D.  ECF No. 43 at 30-32.

14  Additionally, advocating for an entirely different reading of the Treaty Map,

15  Defendants argue that the Map "shows the entire reservation boundary located

16  *north* of Tract D, as evidence by the unmistakable 46th parallel."  *Id*. at 33-34

17  (emphasis in original).  Defendants assert that the Tract D boundary dispute was

18  officially settled in 1904 when Congress expressly adopted the Barnard Survey,

19  discussed in further detail below, as the southwest boundary of the Yakama

20  Reservation.  *Id*. at 36-39.

The proper starting point for analyzing the Yakama Reservation's southwest boundary is the plain language of the Treaty of 1855. To this much the parties agree. The Treaty of 1855 created the Yakama Reservation, and Article II of the Treaty specifically describes the reservation boundaries. However, as Plaintiff's expert, Dr. Andrew Fisher, explains, the Treaty's language suffers from significant "ambiguities and errors." ECF No. 51-1 at 28. The Treaty generally describes the reservation boundaries with reference to natural landmarks, some of which do not exist nor conform to the topography of the area described. For example, the Treaty describes the southwest boundary as running southerly along the main ridge of the Cascade Mountains, "passing south and east of Mount Adams, to the spur whence flows the waters of the Klickitat and Pisco Rivers; thence down said spur to the divide between the waters of said rivers; . . . ." ECF No. 38 at 297. But there is no spur leading off the main ridge of the Cascades "whence flows the waters of the Klickitat and Pisco Rivers," making the language "an impossible call to follow." ECF No. 51-1 at 28. For these reasons, the Treaty's description of the Reservation boundary is concededly "not clear and precise." *Yakima Tribe v. United States*, 16 Ind. Cl. Comm. at 560. Accordingly, at this time, on this record, the Court cannot accept Plaintiff's contention that the "plain language of the Treaty extends the Yakama Reservation's western boundary south of Mount Adams to include Tract

D." ECF No. 36 at 27. The Court does not yet find such clarity in the Treaty's plain language.

Plaintiff asserts that the Territorial Governor Stevens' Treaty Map confirms that Tract D is within the Yakama Reservation. *Id.* at 28. The Treaty Map, dated June 12, 1855, shows the Yakama Reservation boundary as running slightly west of the Cascades, enclosing all of Mount Adams, and then passing south of Mount Adams before turning east. *See* ECF Nos. 39 at 19; 51-1 at 29. However, given the small scale of the map and lack of important landmarks along the boundary, it is difficult to identify precisely where the southwest boundary is located. The Treaty Map "also distorts the actual terrain south and east of Mount Adams." ECF No. 51-1 at 30. Moreover, Defendants argue that the Treaty Map places the entire Yakama Reservation some distance above the 46th parallel, which arguably excludes Tract D from the reservation boundaries. ECF No. 43 at 34. During oral argument, Defendants specifically asserted that the unincorporated community of Glenwood fits squarely on the 46th parallel, far south of the Treaty Map's boundary line. Plaintiff countered that neither the Treaty of 1855 nor the Treaty minutes mentioned the 46th parallel, and Defendants failed to present any evidence that the Yakamas understood latitude and longitude. Ultimately, based on these arguments, the Court is unable to conclude that the Treaty Map cures the Treaty's ambiguous language.

1    Nor does the Court find persuasive the numerous surveys conducted by the

2    United States between 1861 and 1926, which Defendants heavily rely upon to

3    support their preferred boundary line.  There are three surveys from this time

4    period that seem particularly relevant to the Tract D issue.  The Schwartz Survey,

5    completed in 1890, placed the western boundary of the Yakama Reservation 20

6    miles east of the main ridge of the Cascade Mountains, and has been explicitly

7    rejected by Congress in 1904 and the ICC in 1966.  ECF Nos. 47 at 74 (Act of

8    1904); 38 at 337-38 (ICC Findings of Fact).  The Barnard Survey, completed in

9    1899, recommended adding 357,878 acres to the Yakama Reservation west of the

10   erroneous boundary established by the Schwartz Survey.  ECF No. 38 at 340.  As

11   Defendants emphasize, Congress partially approved Barnard's recommendations,

12   recognizing that 293,837 acres belonged to the Yakama Reservation by Section I

13   of the Act of 1904, and the Barnard line was thereafter used by the Ninth Circuit in

14   1911 and the Supreme Court in 1913 in order to resolve disputes to lands between

15   the Schwartz and Barnard surveys.  *See* ECF No. 47 at 74 (Act of 1904); *N. Pac.*

16   *Ry. Co. v. United States*, 191 F. 947 (1911), *aff'd*, 227 U.S. 355 (1913).  Finally,

17   the Pecore Survey, which was made in 1920-1924 and accepted by the General

18   Land Office in 1926, recognized the Reservation's western boundary along the

19   main ridge of the Cascade Mountains to a point about 30 miles north of Mount

20   Adams.  *See* ECF No. 38 at 450.

1    Plaintiff rejects all three surveys, while Defendants appear to champion the

2    Barnard Survey as establishing the true southwest boundary of the Yakama

3    Reservation.  Plaintiff argues that the three surveys are erroneous because they

4    were completed without consulting the original Treaty Map, which was misplaced

5    by the United States shortly after arriving at the Office of Indian Affairs and not

6    rediscovered until 1930.  ECF Nos. 36 at 6; 51-1 at 30.  Plaintiff also notes that the

7    Barnard Survey was specifically based on the White Swan Map, a second map

8    drafted by Territorial Governor Stevens to depict the boundaries of the Yakama

9    Reservation, which contained many inaccuracies.  ECF Nos. 36 at 6-8; 39 at 21; *N.*

10   *Pac. Ry. Co. v. United States*, 227 U.S. 355, 363 (1913).  Like Plaintiff, the Court

11   finds reasons to doubt the veracity of all three surveys.  That said, the Court's

12   skepticism towards the surveys does not necessarily confirm the correct location of

13   the southwest boundary line.

14   According to Defendants, Congress conclusively settled this boundary

15   dispute when it recognized the erroneous nature of the earlier Schwartz Survey and

16   adopted the Barnard line as the new boundary in the Act of 1904, 33 Stat. 595.

17   ECF 43 at 36.  It is well-established that "[o]nce a block of land is set aside for an

18   Indian Reservation and no matter what happens to the title of individual plots

19   within the area, the entire block retains its reservation status until Congress

20   explicitly indicates otherwise."  *Solem v. Bartlett*, 465 U.S. 463, 470 (1984).

Defendants contend that Congress "purposefully and unambiguously changed and relocated the boundaries of the Yakama Nation reservation" by adopting the Barnard line and adding 293,837 acres to the Yakama Reservation.  ECF No. 43 at 38.  Indeed, the plain language of the Act of 1904, which makes lands open for public settlement, indicates that 293,837 acres had been erroneously excluded from the Yakama reservation according to the findings and recommendations of the Barnard Survey.  ECF No. 47 at 74.  In recognizing the Barnard line, Congress specifically declared that tract of land "shall be regarded as a part of the Yakima Indian Reservation *for the purposes of this Act*."  *Id*. (emphasis added).

Thus, by adopting the Barnard Survey in the Act of 1904, Congress explicitly recognized the erroneous boundaries of the Yakama Reservation.  In doing so, Congress relied on the Barnard Survey, which Plaintiff also persuasively argues is incorrect for reasons discussed above.  In the Ninth Circuit, "[i]f there is a general rule, then it is that an incorrect survey may not be relied upon to reduce the legal boundaries of an Indian reservation."  *Sekaquaptewa v. MacDonald*, 626 F.2d 113, 118 (9th Cir. 1980).  The United States cannot "by an incorrect survey deprive the Indians of their right of occupation of the land within the legal boundaries of the reservation . . . ."  *N. Pac. Ry. Co. v. United States*, 191 F. at 958.  As such, the Court has serious doubts as to whether the Act of 1904, a settlement Act, is truly dispositive of this boundary dispute, as Defendants maintain.

After the Treaty Map was rediscovered in 1930, the Yakama Nation continued its efforts to confirm Tract D's location as within the exterior boundaries of the Yakama Reservation. These efforts produced two significant results. First, on February 25, 1966, the ICC determined that "'Tract D' was intended to be included within the Yakama Reservation." ECF No. 38 at 347 (ICC Findings of Fact). In confirming that Tract D was within the exterior boundaries of the Yakama Reservation, the ICC described the boundaries of Tract D as follows:

> We find, therefore, that it was the intention of the parties to the Yakima Treaty that the reservation boundary should follow the main ridge of the Cascade Mountains passing over Mount Adams and continuing to the south following a distinct spur which runs southerly and easterly from Mount Adams and then turning in an easterly and northeasterly direction to Grayback Mountain.

*Id*. at 348. As a result, the Yakama Nation was able to pursue its monetary claim for title to land within Tract D that passed out of the Yakama Nation's ownership without just compensation. ECF No. 36 at 14. However, as Plaintiff concedes, the ICC did not have the authority to return specific property to a claimant; it could only grant money damages for alleged takings. As such, the ICC decision did not correct the reservation boundaries or otherwise restore land to the Yakama Reservation. Accordingly, Defendants dismiss the ICC's 1966 ruling on Tract D as nonbinding on the boundary issue presently before the Court. ECF No. 43 at 36-39, 42-44.

Because the ICC decision did not have the effect of returning land to the Yakama Reservation, the Yakama Nation sought executive action to accomplish the return of its land. Hence, the second important post-1930 event in this boundary dispute. On May 20, 1972, President Richard Nixon issued Executive Order 11670, providing for the "return" of 21,000 acres to the Yakama Reservation. 37 Fed. Reg. 10431. The land at issue was "a tract of some 21,000 acres, then mistakenly thought to be public land," that President Theodore Roosevelt had designated as part of the Mount Rainier Forest Reserve in 1908, now called the Gifford Pinchot National Forest. *Id*. President Nixon spoke approvingly of the ICC decision, specifically the ICC's finding that "this tract had originally been intended for inclusion in the Yakama Reservation." *Id*. The ICC recognized this 21,000 acres as a portion of the disputed Tract D. Then, President Nixon stated his intent to modify "the eastern boundary of the Gifford Pinchot National Forest as follows":

> Beginning at the point on the main ridge of the Cascade Mountains, where the Yakima Indian Reservation boundary as located by the 1926 Pecore survey from Goat Butte intersects said main ridge; thence southwesterly along the main ridge of the Cascade Mountains to the summit or the pinnacle of Mount Adams . . .; thence southerly along a divide between the watersheds of the Klickitat and White Salmon Rivers as shown on the 1932 Calvin Reconnaissance Survey Map . . . to its intersection with the north line of Section 34, Township 7 North, Range 11 East, Willamette Meridian.

*Id*.

Thus, President Nixon adopted portions of the Pecore Survey and the Calvin Survey as the western boundary of the Yakama Reservation. The Calvin Survey, completed in 1932, was the first survey to identify the area now referred to as Tract D. *See* ECF 39 at 27. While Plaintiff asserts that President Nixon "used the 1932 [Calvin Survey], which depicts Tract D of the Yakama Reservation, to describe the land that was being returned to the Yakama Nation," the plain language of the Executive Order suggests that the new boundary President Nixon announced was perhaps more limited. ECF No. 36 at 17. The Court remains unclear as to the proper position of the southwest boundary line following Executive Order 11670.

In sum, after thoroughly reviewing the parties' briefing and the voluminous record, the Court is unable to conclude that Plaintiff is likely to succeed on the merits of its remaining Tract D claim. Though the Court finds many of Plaintiff's arguments compelling, at this stage of the litigation, substantial questions remain as to the precise location of the Yakama Reservation's southwest boundary. Specifically, Plaintiff has not satisfied the Court of where exactly the southwest boundary should be located—perhaps the Calvin line or the 1982 Scherler line—or clarified the exact impact of Nixon's Executive Order.[1] During oral argument, the

---

[1] Also missing from the record is a precise description of the land within Tract D. In 1887, Congress passed the General Allotment Act of 1887, commonly

parties noted their intent to present expert reports and expert witnesses to further

expand on these difficult boundary issues, which the Court would certainly find

beneficial. And with the date for the bench trial quickly approaching, the Court is

mindful that these decades-old boundary disputes will be promptly litigated on a

full record and likely resolved only a few months from today.

**B. Irreparable Injury**

A plaintiff seeking injunctive relief must "demonstrate that irreparable injury

is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in

original). "Issuing a preliminary injunction based only on a possibility of

irreparable harm is inconsistent with [the Supreme Court's] characterization of

injunctive relief as an extraordinary remedy that may only be awarded upon a clear

showing that the plaintiff is entitled to such relief." *Id.*

---

known as the Dawes Act, which authorized the division of reservations into

individual parcels (allotments) to be distributed among tribal members and the sale

of any surplus land to non-Indians (patented land). Thereafter, the Act of 1904

specifically authorized the sale and disposition of surplus or unalloted lands on the

Yakama Reservation. Viewed in this context, questions remain as to the current

status of the land within Tract D. For example, what portion of land is unpatented

and thus owned by the federal government, or owned by the state, etc.?

1    Here, Plaintiff insists that the irreparable harm requirement is satisfied

2    whenever state law enforcement action infringes upon a tribe's sovereignty.  ECF

3    No. 36 at 59.  The Court declines to presume irreparable harm under the

4    circumstances of this case.  Without an injunction, the Yakama Nation will

5    continue to be able to enforce its own civil and criminal authority over its members

6    within Indian Country.  Accordingly, the Court determines that Plaintiff will not

7    suffer irreparable harm in the absence of an injunction.

8    **C. Balance of Hardships and Public Interest**

9    "In each case, courts must balance the competing claims of injury and must

10   consider the effect on each party of the granting or withholding of the requested

11   relief."  *Winter*, 555 U.S. at 24 (quotation marks and citation omitted).  The Court

12   must balance the hardships to the parties should the *status quo* be preserved against

13   the hardships to the parties should Plaintiff's requested relief be granted.  "In

14   exercising their sound discretion, courts of equity should pay particular regard for

15   the public consequences in employing the extraordinary remedy of injunction."  *Id.*

16   (quotation omitted).  "The public interest inquiry primarily addresses impact on

17   non-parties rather than parties."  *League of Wilderness Defs./Blue Mountains*

18   *Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (citation

19   omitted).  Regardless, the Court will not grant a preliminary injunction unless the

20   public interests in favor of granting an injunction "outweigh other public interests

1 that cut in favor of *not* issuing the injunction." *Cottrell*, 632 F.3d at 1138

2 (emphasis in original).

3     Here, Plaintiff asserts that maintaining the status quo "perpetuates an

4 ongoing existential threat to the Yakama Nation's Sovereignty that has become

5 acute in light of the retrocession of Public Law 280 jurisdiction the federal

6 government accepted and the political agitation of county officials with respect to

7 the Yakama Reservation's true boundaries." ECF No. 36 at 59. Plaintiff maintains

8 that protecting the Yakama Reservation's boundaries is in the public interest as it

9 promotes self-government and self-determination. *Id*. at 60. Defendants respond

10 that an injunction curtailing law enforcement in Tract D for the duration of this

11 litigation would impose unworkable burdens on law enforcement and exacerbate

12 public safety issues faced by Yakama members and non-Indians who reside in the

13 area. ECF No. 43 at 54-55, 57.

14     Having resolved the Public Law 280 issue, the Court tends to agree with

15 Defendants. Defendants' legitimate interest in maintaining public safety for both

16 Yakama members and non-Indians within Tract D outweighs the potential

17 infringement on the Yakama Nation's sovereign rights, particularly when the

18 Yakama Nation is not prevented from continuing to enforce its criminal laws

19 against its members and this dispute has existed for decades. While the Court

20 agrees that tribal self-government and self-determination are in the public's

interest, the Court finds that these public interests do not outweigh the competing public interests that favor not issuing the injunction at this time. Accordingly, the Court denies Plaintiff's Motion for Preliminary Injunction (ECF No. 36).

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Plaintiff's Motion for Preliminary Injunction (ECF No. 36) is **DENIED**.

2. Defendants' Request for Judicial Notice (ECF No. 55) is **GRANTED**.

The District Court Executive is directed to enter this Order and furnish copies to counsel.

**DATED** March 6, 2019.



THOMAS O. RICE
Chief United States District Judge