JEFFREY BOSSERT CLARK
Assistant Attorney General

AMBER BLAHA
DARON CARREIRO
CHRISTINE ENNIS
U.S. Department of Justice
Environment and Natural Resources Division
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044
(202) 305-5331

*Attorneys for the United States*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

_____

THE CONFEDERATED TRIBES
AND BANDS OF THE
YAKAMA NATION,

      Plaintiff,

      v.

KLICKITAT COUNTY, ET AL.,

      Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)

No. 1:17-cv-03192-TOR

AMICUS CURIAE BRIEF OF THE
UNITED STATES

# TABLE OF CONTENTS

Introduction ................................................................................................1

Background ................................................................................................2

    1.    1855 Treaty History and Text ................................................ 2

    2.    Early Survey History of the Yakama Reservation. ........................... 3

    3.    1904 Act ................................................................................ 5

    4.    Northern Pacific Railway Co. v. United States .................................. 6

    5.    The Discovery of the Treaty Map and Subsequent Surveys. .............. 7

    6.    Indian Claims Commission ................................................ 8

    7.    Executive Order 11670 restores title to lands within Tract D to the Yakama Nation. .................................................................. 11

    8.    1981 Survey ................................................................ 12

ARGUMENT ................................................................................13

    I.    The 1981 Survey Delineates the Official Reservation Boundary. .......13

    II.    The 1981 Survey Reflects the Best Interpretation of the 1855 Treaty14

    III.    The 1981 Survey Reflects the Boundary That Has Been Litigated and Settled for More Than Fifty Years. ........................................19

    IV.    The 1904 Allotment Act Did Not Modify the Reservation Boundary. ........................................................................22

    V.    For More Than Fifty Years, Federal Agencies Have Consistently Treated Tract D as Within the Reservation. ........................................25

    VI.    Affirming the Treaty Boundary as Including Tract D Would Not Cause Significant Jurisdictional Changes for Residents of that Area.28

CONCLUSION ................................................................................30

i

**INTRODUCTION**

At the Court's invitation (ECF No. 59), the United States respectfully submits this *amicus curiae* brief in support of the 1855 Treaty boundaries of the Yakama Reservation, which include Tract D and have never been diminished.

The Yakama Reservation was guaranteed as a homeland for the Confederated Tribes and Bands of the Yakama Nation in an 1855 Treaty with the United States, negotiated on behalf of the United States by Isaac Stevens, the Governor of the Washington Territory.  In that Treaty, the Tribe agreed to cede approximately 10 million acres of land to the United States, while retaining a much smaller Reservation.  After transmitting the Treaty back to Washington, federal officials misplaced the "Treaty Map" that had accompanied the negotiation and signing of the Treaty, leading to confusion and disputes over the Reservation's boundaries.

The present case is about the proper location of the southwestern boundary of the Yakama Reservation, and whether that boundary includes within it a section of land known as "Tract D."  There is an undisputed *southern* boundary that runs from the Yakima River, on the eastern boundary of the reservation, westward to a point known as "Grayback Mountain" on the southern boundary of the Reservation.  But Grayback Mountain is still approximately 20 to 25 miles from Mount Adams and the main ridge of the Cascade Mountains.  The question, therefore, is whether the southwestern border of the Reservation forms a straight southeastern line from Mount Adams to Grayback Mountain (which would exclude Tract D), or follows the natural ridge south and then east of Mt. Adams, via a "spur," to Grayback (which would include Tract D).

From the United States' perspective, this issue has long been resolved.  The Department of the Interior ("DOI")—which has statutory authority to survey reservation boundaries—has included Tract D within the Yakama Reservation

1

since the early 1930s, after the Treaty Map was located and DOI recognized that earlier surveys did not comport with the Treaty, the intent of the signers, or the topographic features on the ground.  DOI officials concluded in 1932 that the boundary extended along a natural ridge south and then east of Mt. Adams, via a well-defined "spur," to Grayback Mountain, inclusive of Tract D.  This boundary was then litigated at length in the 1960s before the Indian Claims Commission ("ICC"), which unequivocally held that Tract D falls within the 1855 Treaty boundaries of the Reservation.  And in 1972, President Nixon issued an Executive Order returning 21,000 acres of federal land within Tract D to Yakama Nation title, expressly based on the understanding that the Reservation included Tract D.

DOI included Tract D within the Yakama Reservation in its 1981 formal cadastral survey, and in the physical monumentation of its boundaries.  This 1981 survey continues to represent the official position of DOI regarding the reservation boundary.  *See* Shaw Decl., Ex. A (BIA map showing surveyed southwestern boundary).  In the United States' view, and as explained further below, this survey comports with the best interpretation of the Treaty and the intent of the parties.

## BACKGROUND

The United States understands that the Court is familiar with the factual background surrounding the Tract D dispute, *see* Order Denying Plaintiff's Motion for Preliminary Injunction at 11-20 (ECF No. 58), and will receive additional evidence on this issue at trial.  For this reason, this brief does not provide a comprehensive recitation of the facts, but rather highlights only the most salient facts from the United States' perspective.

### 1.  1855 Treaty History and Text

In the Treaty of 1855, "the Yakamas granted to the United States approximately 10 million acres of land in what is now the State of Washington,

2

*i.e.*, about one-fourth of the land that makes up the State today." *Washington State Dept. of Licensing v. Cougar Den, Inc.*, 139 S. Ct. 1000, 1007 (2019) (citing Treaty Between the United States and the Yakama Nation of Indians, art. 1, June 9, 1855, 12 Stat. 951 (Trial Exhibit 6)).[1]  In return, the United States paid the Yakamas $200,000 and agreed to make certain improvements on the remaining Yakama land.  Tr. Ex. 6, arts. 3-4.  The Yakama Nation also reserved certain lands and rights for itself.  139 S. Ct. at 1007.  In particular, the Treaty established the Yakama Indian Reservation, described as follows:

> There is, however, reserved, from the lands above ceded for the use and occupation of the aforesaid confederated tribes and bands of Indians, the tract of land included within the following boundaries, to wit:  Commencing on the Yakama River, at the mouth of the Attah-nam River; thence westerly along said Attah-nam River to the forks; then along the southern tributary to the Cascade Mountains; thence southerly along the main ridge of said mountains, passing south and east of Mount Adams, to the spur whence flows the waters of the Klickitat and Pisco Rivers; thence along said divide to the divide separating the waters of the Satass River from those flowing into the Columbia River; thence along said divide to the main Yakama, eight miles below the mouth of the Satass River; and thence up the Yakama River to the place of beginning.

Tr. Ex. 6, art. 2.  The Treaty also provided that the tract "shall be set apart and, so far as necessary, surveyed and marked out…."  *Id.*

## 2.  Early Survey History of the Yakama Reservation

In 1861 surveyors Berry and Lodge defined the Reservation's southern boundary from a portion of the Yakima River (the eastern boundary of the Reservation) to the southeastern corner of the Reservation, then westerly along the

---

[1] Where possible, the United States has cited to the Trial Exhibits identified by the parties.  *See* Plaintiff's Witness and Exhibit List (ECF No. 61); Defendants' Trial Witness and Exhibit Lists (ECF No. 62).

southern border to Grayback Mountain. Tr. Ex. 83 at YN 507; Tr. Ex. 80 (Berry/Lodge survey map). The southeastern and southern boundary was surveyed again in 1885 by Harry Clark. Tr. Ex. 46 at YN 332 (1966 ICC Findings of Fact); Tr. Ex. 85 at YN 1041; Tr. Ex. 83 at YN 507.

No attempt was made to survey the remainder of the southern boundary or any portion of the western boundary for more than thirty years after the Treaty signing, until George E. Schwartz surveyed the south and west boundary of the Reservation in 1890. Tr. Ex. 76 at 11. Schwartz admitted that he departed from Treaty text, which placed the western boundary along the main ridge of the Cascade Mountains. *Id.* at 12. But because the Treaty did not expressly call for crossing the Klickitat River, Schwartz terminated the southwestern corner east of the Klickitat River, and substantially east of the Cascades. Tr. Ex. 85 at YN 1041; *see also* Tr. Ex. 35 at 2 (U.S. Geological Survey Map showing survey lines); Tr. Ex. 79.

In response to the Yakamas' dissatisfaction over the Schwartz survey, Tr. Ex. 76 at 10, E.C. Barnard, a topographer of the United States Geological Survey, revisited the Reservation boundaries. On the western boundary, rather than proceeding "southerly along the main ridge" of the Cascade Mountains, and then passing "south and east of Mount Adams" to a "spur," as called for in the Treaty, Barnard ran two arbitrary straight lines, both entirely east of the main ridge of the Cascade Mountains. *Id.* at 9. The first went from Spencer Point to what he called "a conical hump," or Goat Butte, northeast of Mount Adams. Tr. Ex. 79. The second went from that hump directly southeast to Grayback Mountain. Tr. Ex. 76 at 9.

Like Schwartz, Barnard's own report in 1900 admitted that his line did not conform to the calls in the Treaty text. *Id.* at 8, 12. Barnard recognized that, "[t]he important clause of this treaty is that the summit of the Cascade Mountains

4

should form a part of the western boundary." *Id*. at 8.  But he drew his straight-line boundary east of the main ridge.  Tr. Ex. 46 at YN 334-37.  Barnard's notes acknowledge that he was not able to follow the main ridge from the north towards Mount Adams because of deep snow.  Tr. Ex. 76 at 7.

These surveys were conducted without the benefit of the Treaty Map. During these early surveys, surveyors relied instead on a base map known as "the White Swan" map, which was believed to have been prepared by, or traced from, Governor Stevens in 1857.  Tr. Ex. 58 (White Swan map); Tr. Ex. 76 at 8.  The White Swan map misrepresented the Reservation boundary, misidentified topographical features, and has now been discredited, particularly after comparison to the actual Treaty Map.  *Northern Pac. Ry. Co. v. United States*, 227 U.S. 355, 363 (1913) (White Swan map "has many inaccuracies" and "adds to the confusion" of trying to discern the boundaries.)

### 3.  1904 Act

Even as Yakama tribal representatives continued to dispute the accuracy of these surveys in the late nineteenth century, congressional policy turned towards the allotment, or privatization, of tribal lands previously held in common.  The General Allotment Act of 1887 authorized the President to survey and divide tribal lands into allotments for individual Indians.  24 Stat. 388 (Feb. 8, 1887). After being allotted to individual Indians, "surplus" land would then be available for sale to non-Indians.

Congress authorized negotiations with Yakama tribal representatives between 1896 and 1901 but failed to reach an agreement to allot the Reservation. Tr. Ex. 20 at 5 (1904 House Report).  The Yakama Nation's concern about the erroneous boundary was a substantial obstacle to any agreement.  Tr. Ex. 76 at 5; S. Doc. No. 337, 63rd Cong., 2nd Sess., 155-156 (Dec. 20, 1913).  In 1904, Congress enacted a statute "to authorize the sale and disposition of surplus or

unallotted lands of the Yakima Indian Reservation." 33 Stat. 595 (Dec. 21, 1904). That statute directed the Secretary of the Interior "to sell or dispose of unallotted lands embraced in the Yakima Indian Reservation proper…." *Id*. § 1. The Act also provided:

> that the claim of said Indians to the tract of land adjoining their present reservation on the west, excluded by erroneous boundary survey and containing approximately two hundred and ninety-three thousand eight hundred and thirty-seven acres, according to the findings, after examination, of Mr. E.C. Barnard … is hereby recognized, and the said tract shall be regarded as part of the Yakima Indian Reservation.

*Id*. The statute provided that the proceeds of the land sales would be deposited in the Treasury for the Tribe's benefit. *Id*. § 4. Congress also directed the Secretary of the Interior "to define and mark the western portion of said reservation, including the adjoining tract of 293,837 acres, to which the claim of the Indians is, by this Act, recognized…." *Id*. § 8. A survey was then conducted in 1907 by Campbell, Germond, and Long, which largely tracked the straight-line Barnard survey, again contrary to both the local topography and text of the Treaty. Tr. Ex. 113 (1933 map depicting survey lines); *see also* Tr. Ex. 35.

### 4. Northern Pacific Railway Co. v. United States

After the 1904 Act, the United States sought to recover the lands between the Schwartz and Barnard lines that had been erroneously patented to the Northern Pacific Railroad Company. *Northern Pac. Ry. Co. v. United States*, 191 F. 947 (9th Cir. 1911), *aff'd* 227 U.S. 355 (1913). "The special controversy in the case [was] the location of the *western* boundary of the reservation." 227 U.S. at 359 (emphasis added). The Ninth Circuit concluded that because the location of the western boundary "along the main ridge of [the Cascade] mountains" is "the most certain and material call of the description it should prevail," 191 F. at 955, and the Supreme Court affirmed. 227 U.S. at 372. The Court did not directly address the disputed southwestern boundary.

6

Although the Supreme Court expressly endorsed the "correctness of the Barnard survey," *id*. at 366, much of the Court's reasoning is inconsistent with the Barnard line, which also never reaches the main ridge of the Cascades that the Court said should form the western boundary. For example, the Court concluded that the western boundary included Mount Adams. *Id*. at 360 (rejecting the railroad's argument that "the words 'passing south and east of Mount Adams' qualified the word 'mountains'," which would mean that the Treaty intended to identify not *the* main ridge, but only *a* main ridge "passing south and east of Mount Adams"). To effectuate the Supreme Court's determination, DOI directed Chester Pecore, cadastral engineer, to survey the main divide of the Cascades, which he did between 1920 and 1924. Tr. Ex. 83 at YN 508. Pecore concluded that the western boundary followed a portion of the main ridge of the Cascades, thus corresponding to the calls of the Treaty in this area (and including an additional 47,593 acres of land). *Id*. In the southwest, however, Pecore's boundary was still similar to Barnard's, beginning at the same conical hump, Goat Butte, northeast of Mount Adams, and continuing to Grayback via slightly different straight lines. *Id*. at YN 508, YN 515; Tr. Ex. 35.

**5. The Discovery of the Treaty Map and Subsequent Surveys**

The original Treaty Map was finally re-discovered in 1930, at which time the Commissioner of Indian Affairs insisted that the General Land Office review its surveyed line. Tr. Ex. 60 at KC 831 (1932 Wilkes Report); Tr. Ex. 85 at YN 1041. DOI firmly rejected the notion that the southwestern boundary was settled by the earlier surveys or any action by the courts or Congress. Tr. Ex. 52 at KC 820-22. And, although DOI had previously assumed that the Pecore survey identified the correct southwestern boundary, "[b]ased upon the discovery of this map and the long existing claims of the Indians, it became evident to this Department that for the first time an authentic depiction of the exterior limits of

7

the reservation which Governor Stevens represented to the Indians as the lands on which they were to be located, was available." *Id.* at KC 823. Thus, DOI opined that a newly designated "Treaty line," not the Barnard or Pecore lines, more accurately reflected the Treaty. *Id.* at KC 825-26.

DOI commissioned a "reconnaissance cadastral and topographic survey" led by cadastral engineer E.D. Calvin, and completed in 1932. Reports submitted the same year showed that there is indeed a well-defined ridge or "spur" running southerly from Mount Adams, thence easterly to Grayback Mountain, "follow[ing] the treaty reading and map as closely as possible when applying present known topography to conditions as the treaty makers understood them to be." Tr. Ex. 60 at KC 832; *see also* Tr. Ex. 2 (1932 Calvin Report); Tr. Ex. 59 (1933 Wilkes Report); Tr. Ex. 85 at YN 1041; Tr. Ex. 1 (Calvin reconnaissance map).

By 1939, the Secretary of the Interior had informed Congress that: "[a]s a result of an exhaustive study, extending over a period of years, this Department has heretofore concluded that the boundary claims of the Yakima Indians are meritorious." Tr. Ex. 85 at YN 1040. More specifically, in a memorandum submitted to the Senate, DOI stated its view "that in order to satisfy the calls of the treaty, this natural boundary [as surveyed by Calvin and Wilkes in 1932] should have been followed in establishing the southwest boundary of the reservation, rather than the straight line arbitrarily drawn to mark the present southwest boundary between Grayback Mountain and Mt. Adams." *Id*. at 1041-42.

**6. Indian Claims Commission**

Although the Nation had seen federal recognition of its western boundary march westward to encompass, first, the Barnard line, and then the Pecore line, the Nation continued pressing boundary claims in Congress. Testimony of one

8

witness in 1939 establishes that, "[s]ince 1911 . . . [the Yakima delegation] had ask[ed] that the southwest boundary of the Yakima Indian Reservation be reestablished, and every year since that . . . they have always said that was part of their reservation." Tr. Ex. 22 at KC 1386. In 1939, the Nation succeeded in bringing to committee a special jurisdictional bill that would have given the Nation access to the courts to assert its continued claim to "additional lands southwest of their present reservation," but the bill did not pass. Tr. Ex. 44 at YN 556 (1939 House Report enclosing a March 7, 1939 letter from the Attorney General).

Congress passed the Indian Claims Commission Act of 1946, 60 Stat. 1049 (Aug. 13, 1946), to establish an Indian Claims Commission to deal once and for all with tribes' claims against the United States. *See United States v. Dann*, 470 U.S. 39, 45 (1985). The ICC was authorized to grant money damages, but not title or equitable relief. *E.g.*, *United States v. Mitchell*, 445 U.S. 535, 539 (1980). In 1949, the Yakama Nation petitioned the ICC alleging, in part, that lands in Tract D were properly reservation lands and had been sold without compensation to the Nation. *See Yakima Tribe v. United States*, 158 Ct. Cl. 672, 676 (1962). As in many other ICC cases, therefore, determining the correct reservation boundary was a prerequisite for monetary relief.

In an effort to avoid this liability, the United States argued that the boundary was conclusively determined by the Supreme Court in *Northern Pacific*, and therefore excluded Tract D. *See id*. at 680 n.2. That argument was initially accepted by the ICC, but was rejected by the Court of Claims, which found no justification for the ICC's "unquestioning submission to the Supreme Court's opinion as controlling in this case." 158 Ct. Cl. at 679-80. The Court of Claims reasoned that the *Northern Pacific* Court did not decide the specific issue of the southwestern boundary, and in any event, its decision had no preclusive effect on

9

the Nation's claims. *Id*. at 681-82. Moreover, the Supreme Court's interpretation of the Treaty calls turned on factual questions for which the proffer of new information provided ample basis for reconsidering the Court's conclusions. *Id*. at 681-82. Accordingly, the Court of Claims remanded to the ICC with instructions to "canvass . . . the specialized materials, old and new, which the parties offer, and to decide, with due regard for the opinions in *Northern Pacific*, whether any or all of Tract[] . . . D rightfully formed part of the Yakima Reservation." *Id*. at 682.

On February 25, 1966, the ICC concluded that "'Tract D' was intended to be included within the Yakima Reservation." Tr. Ex. 46 at YN 343. To the ICC, the Treaty calls relating to the southwest border appeared "impossible," because they did "not fit the actual topography." Tr. Ex. 47 at YN 352 (1966 ICC Opinion). Of the "new materials" considered, the most pertinent to the ICC was the Treaty Map, which "show[ed] a boundary which extends a considerable distance due south of Mount Adams." *Id*. at YN 347, 355. Although Tract D extended still further south, the ICC found this discrepancy in distance "not at all surprising," and attributed it to the "obvious uncertain knowledge of the topography (particularly in this area)." *Id*. at YN 355. The ICC further concluded that the Tract D boundary best satisfied the Treaty calls and was the intention of the Treaty makers because it followed "a distinct spur which runs southerly and easterly from the southern slopes of Mount Adams." *Id*. at YN 355-56.

The takings claim, along with a similar claim elsewhere on the Reservation, was settled for $2.1 million paid by the United States. Tr. Ex. 45 at YN 390 (1968 ICC Final Judgment). The ICC's determination that Tract D "was intended to be included within the Yakima Reservation," Tr. Ex. 46 at YN 343, also set the stage for the Tribe to reclaim title to other unpatented lands in Tract D that had not been transferred to private ownership. In particular, the ICC severed the Tribe's claim to 21,000 acres in the northern portion of Tract D that had been withdrawn by

10

Presidential Proclamation in 1907 and were part of Gifford Pinchot National Forest, in order to seek restoration of Indian title.  Tr. Ex. 116 (1972 ICC Order Dismissing Claim With Prejudice).

### 7. Executive Order 11670 restores title to lands within Tract D to the Yakama Nation

In January 1969, Secretary of the Interior Udall wrote to the Secretary of Agriculture urging "prompt restoration of the Yakima tribal lands that were erroneously included in the Gifford Pinchot National Forest."  Shaw Decl. Ex. B. After discussions on this issue among the agencies and with the Vice President's National Council on Indian Opportunity (NCIO), Tr. Ex. 128 (1970 NCIO Internal Memorandum) and Shaw Decl. Exs. B-D, the question of the President's legal authority to transfer land title was presented to the Attorney General.  Attorney General Mitchell issued an opinion addressing whether "some 21,000 acres of land in the State of Washington, which were originally intended to be included within a reservation established by an 1855 treaty with the Yakima Tribe of Indians, but which have been administered by the Forest Service as part of a national forest since 1907, have been 'taken' from the Tribe by the United States within the meaning of the Fifth Amendment to the Constitution."  42 Op. Atty. Gen. 441 (Jan. 18, 1972) (Tr. Ex. 24).  If the land was not "taken," he concluded, title could be restored to the Tribe by Executive action; otherwise, legislation would be required.  *Id.* at 441-42.

On the legal question, the Attorney General reasoned that a "physical appropriation of private property by the Executive does not result in a Fifth Amendment 'taking' for which the United States is liable, unless the Executive action is authorized by Congress" or subsequently ratified by Congress.  *Id.* at 445-46 (citations omitted).  The Attorney General concluded that the taking of *reservation* lands was not authorized by Congress, since the statute authorizing the

11

President to reserve forest lands prohibited modification of existing Indian treaty reservations. *Id.* at 447.

Relying on the Attorney General's opinion, on May 23, 1972, President Nixon issued Executive Order 11670, "Providing for the Return of Certain Lands to the Yakima Indian Reservation." 37 Fed. Reg. 10431 (Tr. Ex. 25). That Executive Order noted that the 21,000-acre tract was "mistakenly thought to be public land" when made part of the forest reserve, and ordered that the boundary of the Gifford Pinchot National Forest be modified to not include this parcel of land. *Id.* The Executive Order also directed the Secretary of the Interior "to assume jurisdiction over the tract of land … and to administer it for the use and benefit of the Yakima Tribe of Indians as a portion of the reservation created by the Treaty of 1855, 12 Stat. 951." *Id.* at 10432. As a result, these lands are now held in trust for the Yakama Nation.

**8. 1981 Survey**

In 1978, the BLM Chief of Cadastral Survey, Oregon State Office, authorized a survey of the southwesterly boundary of the Yakama Indian Reservation. Tr. Ex. 49. BLM Cadastral Surveyor Ronald Scherler began his survey in 1978, joined by nine field assistants, including another land surveyor, surveying technicians, and surveying aids, and completed the survey in 1981. Tr. Ex. 74. Scherler's survey field notes review the history of federal surveys of the area, describe his methodology, and track in detail the survey course along the southwestern boundary, noting angle measurements and the monumentation of boundary corners with iron posts and marked brass caps. *Id.* In 1982, the Chief Cadastral Surveyor of Washington approved Scherler's survey. *Id.* at 102. BLM has not re-surveyed the southwestern boundary of the Yakama Reservation since 1981.

**ARGUMENT**

**I.    The 1981 Survey Delineates the Official Reservation Boundary.**

In the view of the United States, the 1981 cadastral survey by BLM is an accurate reflection of the boundaries of the Yakama Indian Reservation, as established by the Treaty of 1855, and continuing until today.  *See* Shaw Decl. Ex. A (map); Tr. Ex. 74.  Congress authorized BLM to survey Indian reservations, along with other public lands.  25 U.S.C. § 176 (survey of Indian reservations); *see also* 43 U.S.C. § 2 (Secretary of Interior or his designee to "perform all executive duties appertaining to the surveying and sale of the public lands of the United States").  The BLM also has authority to correct erroneous public land surveys.  43 U.S.C. § 772.

Federal courts have long recognized the need to refrain from second-guessing government surveys.  In *Craigin v. Powell*, the Supreme Court stated "[t]hat the power to make and correct surveys of the public lands belongs to the political department of the government, and that, while the lands are subject to the supervision of the general land-office, the decisions of that bureau in all such cases . . . are unassailable by the courts, except by a direct proceeding…." 128 U.S. 691, 698-99 (1888); *see also id.* at 699 (noting the "great confusion and litigation [that] would ensue if the judicial tribunals were permitted to interfere and overthrow the public surveys") (citation and internal quotation marks omitted).  *Craigin* addressed a survey that determined title to public lands, but the animating principles of repose and deference to the expertise of the Executive branch maintain their force here: the Court should refrain from revisiting a nearly forty-year old BLM survey (which is similar to the Calvin survey completed nearly *ninety* years ago), undertaken pursuant to express statutory authority, which reflects the considered views of the Department of the Interior.

In contrast, surveys of the southwestern boundary of the Reservation conducted prior to 1932, though accepted by the General Land Office, could not effect a diminishment of the Reservation because they are not in accord with the Treaty or Treaty Map.  "[A]n incorrect survey may not be relied upon to reduce the legal boundaries of an Indian reservation."  *Sekaquaptewa v. MacDonald*, 626 F. 2d 113, 118 (9th Cir. 1980) (citing *Northern Pacific*, 191 F. at 958; *see also Northern Pacific*, 227 U.S. at 373.  A government surveyor has "no authority to exclude any of the reserved lands from the boundaries of the reservation."  *United States v. Romaine*, 255 F. 253, 259 (9th Cir. 1919).  Thus, an "error in failing to extend the survey so as to include the lands in controversy cannot prejudice the rights of the Indians."  *Id.* (citations omitted).  Moreover, BLM retains authority to correct its prior surveys.  43 U.S.C. § 772.

## II.    The 1981 Survey Reflects the Best Interpretation of the 1855 Treaty.

In the view of the United States, the 1981 Survey reflects the best interpretation of the 1855 Treaty.  At the outset, we note that Indian treaties "'must be interpreted in light of the parties' intentions, with any ambiguities resolved in favor of the Indians.'"  *Herrera v. Wyoming*, 139 S. Ct. 1686, 1699 (2019) (quoting *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 206 (1999)).  Moreover, the words of a treaty must be construed "in the sense in which they would naturally be understood by the Indians."  *Id.* (quoting *Washington v. Washington State Comm. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 676 (1979).

The 1981 survey best comports with the Treaty text and these principles, for several reasons.[2]  First, it proceeds "southerly" along the "main ridge of" the

---

[2] There is evidence that tribal representatives have long claimed that the reservation boundary extended well south of Mount Adams.  As recounted by the

14

Cascades, a clear Treaty call.  Tr. Ex. 6, art. 2.  Second, the line proceeds southerly while also passing "south and east of Mount Adams," which none of the other proposed boundary lines do.  Survey lines proffered by Barnard and others departed the main ridge of the Cascades *north* of Mt. Adams (error one), and then drew straight lines "southeast" from a "conical hump" known as Goat Butte to Grayback Mountain (error two).  *See, e.g.*, Tr. Ex. 79; Tr. Ex. 83 at YN 515.  Regarding error one, the text does not support leaving the main ridge of the Cascades *north* of Mount Adams, for the conical hump at Goat Butte, which is still *northeast* of Mount Adams.  Tr. Ex. 79; *see also* Tr. Ex. 60 at KC 830-31 (describing "the Conical Hump (Goat Butte)" as "east of Mt. Adams" and saying "[t]here is no logical connection between the treaty and the Barnard survey or that part of the Pecore Survey from where it leaves the summit of the Cascades by way of the Mt. Adams mill and Grayback Peak.").

Regarding error two, the Treaty text uses the term "southeasterly" (or "southesterly") in other places to describe true southeastern lines, demonstrating that the drafters knew how to call for a southeastern line when desired.  *See* Tr.

_____

Ninth Circuit, the federal agent at the Yakima agency in 1889 requested a survey of the southern and western boundary, noting that "it was a subject of disagreement as to which was the 'main ridge'" of the Cascades referred to in the Treaty, with "the Indians claiming that the main ridge extended to the base of Mt. Adams on the south and east while white men with diverse interests claimed that it was further east."  *Northern Pacific*, 191 F. at 949.  Notably, "[a]ll of the country south and east of Mt. Adams for 40 or 50 miles was regarded as part of the Cascade Range, being wholly mountainous…."  *Id.  See also* Tr. Ex. 52 at KC 825 (describing 1930 council of Yakima Indians recounting understanding that Camas Prairie was within the Reservation).

15

Ex. 6, art. 1.  And the Treaty Map confirms true southeastern lines at the places called for in the text.  Tr. Ex. 55 (Treaty Map).  But the Treaty text describes something different for the southwestern boundary of the Reservation, calling for a line that proceeds "southerly" along the main ridge and passing "south and east of Mount Adams."  Tr. Ex. 6, art. 2; Tr. Ex. 60 at KC 831 ("None of the past surveys have ever passed south and east, not southeast, but south then east of Mt. Adams.").

Third and relatedly, the western boundary must proceed "southerly along the main ridge of said [Cascade] mountains" until reaching a "spur."  Tr. Ex. 6, art. 2.  This cannot be done by departing the main ridge prior to reaching Mount Adams, or by cutting east at any other more northerly point, as there is no spur farther north, much less one that could align with the other Treaty calls.  *See* Tr. Ex. 60 at KC 832 ("There is no well-defined spur from Mt. Adams to Signal Peak … the drainages and ridges are all to the southeast….").  Although this line does not follow a "spur whence flows the waters of the Klickitat and Pisco Rivers," Tr. Ex. 6, art. 2, it does follow a spur that lies between the Klickitat and White Salmon Rivers.  There is evidence that the negotiators of the Treaty often confused the various rivers in this area, *see Northern Pacific*, 191 F. at 950, and, adding to the confusion, some maps from this time transposed the Klickitat and White Salmon Rivers, depicting the Klickitat incorrectly lying west of Mount Adams.  *See, e.g.*, Tr. Ex. 58; Tr. Ex. 80.  The Supreme Court also cautioned against allowing this call to "dominat[e] all other calls," especially "without attempting to give them all effect from a consideration of the topography . . . and the testimony."  *Northern Pacific*, 255 U.S. at 362 (finding Schwartz erred by insisting that the boundary follow the divide between the Klickitat and Toppenish Rivers).

16

The 1932 and 1981 survey lines also comport with Governor Stevens' representations to tribal leaders during the Treaty negotiation, where he described the western boundary of the Yakama Reservation as proceeding "**down the main chain of the Cascade mountains south of Mount Adams**, thence along the Highlands separating the Pisco and the Sattass river from the rivers flowing into the Columbia." Tr. Ex. 32 at 65 (1855 Treaty Council Record) (emphasis added). Moreover, when transmitting the signed Treaty, Governor Stevens described the Yakama Reservation as "extending from the Yakama River to the Cascades" and "back[ing] up against the Cascades, affording a fine range for roots, berries, and game." Tr. Ex. 9 at 2 (1855 Stevens Letter); *see also Mille Lacs*, 526 U.S. at 206 (Indian treaties to be "interpreted in light of the parties' intentions, with any ambiguities resolved in favor of the Indians.").

Although contrary to the Treaty text, part of the appeal of the straight southeast Barnard line was that it aligned with statements from tribal members Chief Spencer and Stick Joe. But there is no evidence that either man was at the negotiation or signing of the Treaty, where, among other things, the Treaty Map was displayed to tribal leaders, and the southwestern boundary was described as proceeding south of Mount Adams. *See, e.g.*, Tr. Ex. 542 at KC 4292 (Chief Spencer testifying that he was not at the Treaty negotiation). Indeed, statements by Chief Spencer and Stick Joe were not based on the Treaty Map or any representations by Governor Stevens, but merely repeated post-Treaty statements of federal officials claiming a straight-line boundary. *Id*. at KC 4294-96; Tr. Ex. 520 at 7.

Chief Spencer and Stick Joe were not alone in their understanding of the Reservation's southwestern boundary, but neither was their view universal. As DOI noted in 1932, proceedings of a council of Indians held at the Yakima Indian Agency November 26, 1930, indicated that "the Indians have understood from

traditions handed down to them that the southwest boundary line was to run south to 'Camas Prairie' along a well-defined ridge, and that this area was to be within their reservation." Tr. Ex. 52 at KC 825; *see also* Tr. Ex. 63 at KC 4408 (in 1913, Yakama member reporting that "I know our boundary line is south of Mount Adams."); Tr. Ex. 54 at KC 784 (1930 DOI letter summarizing Yakama understanding that the boundary line ran "South of Camas Prairie along a well defined ridge, and that Camas Prairie was within their reservation"), KC 788-89 (Yakama member Thomas Sam: "Glenwood is inside the Yakima Indian Reservation boundary" and "[t]he line should go through the center of Mt. Adams south to the spur"), KC 794 (Yakama member James Meninick stating that the boundary extends along a spur west of Glenwood).

The 1981 survey boundary also comports best with the Treaty Map, which shows the boundary as proceeding south along the main ridge of the Cascades, passing both south and east of Mount Adams, encompassing the spur south of Mount Adams (arguably even further west than the boundary line) and as including a prairie area. *See, e.g.*, Tr. Ex. 55; Tr. Ex. 59 at KC 844 ("[F]rom this [Treaty] map it is apparent that the makers of the treaty intended to take in a large area south of Mt Adams."): *id.* at KC 845 ("[I]t is clear from the map that [Governor Stevens] intended to include a large tract south of Mt. Adams which would include the area around Glenwood.").

There is a Treaty Map-based counterargument that, because the Reservation is depicted north of the 46th parallel on the map, then Tract D lands—which are mostly south of that parallel—should not be considered part of the Reservation. But the 46th parallel does not appear in the text of the Treaty, nor in the Treaty council discussions, and there is no evidence that Yakamas understood (or would have had reason to consider) its relationship to their reserved lands. *Cf. Fishing Vessel Ass'n*, 443 U.S. at 676 (Treaty words must be construed "in the sense in

which they would naturally be understood by the Indians." (citation omitted)).
Moreover, the argument overlooks other latitudinal and longitudinal inaccuracies
in the Treaty Map, for example incorrectly placing Mount St. Helens north of
Mount Adams, and incorrectly placing the eastern boundary of the Yakama
Reservation significantly east of the 120th degree longitude (whereas the actual
eastern boundary sits approximately on that line).  *Compare* Tr. Ex. 55 *with* Tr.
Ex. 129 (2017 U.S.G.S. Washington State Map).  Finally, the 46th-parallel
argument would exclude large portions of undisputed reserved land, including
most of the lands along the undisputed southern boundary as identified by the
1861 Berry and Lodge survey, and would completely exclude Grayback
Mountain, which is also south of the 46th parallel, and which all surveys have
consistently placed within the Reservation.

### III.    The 1981 Survey Reflects the Boundary That Has Been Litigated and Settled for More Than Fifty Years.

In addition to the treaty text-based arguments described above, the ICC's
1966 decision that Tract D forms part of the reservation also should carry
significant weight.  First, it is persuasive authority that *Northern Pacific* is not
dispositive of the Nation's southwestern boundary.  Second, it represents the
ICC's considered judgment based on a full review of the evidence, including the
first time that any tribunal had evaluated the effect of the Treaty Map.  Finally,
Congress's purpose in establishing the ICC was to create repose, and the United
States and the Yakama Nation have acted in accordance with its decision for the
last 52 years.  That precedent should stand.

The County has argued—as the United States did before the ICC—that the
southwestern reservation boundary was conclusively determined in *Northern
Pacific*.  *See* ECF No. 43 at 17.  But *Northern Pacific* did not address the question
presented in this Court, because the dispute there concerned the western and *not*

the southwestern border.  *See* 227 U.S. at 359.  As the Court of Claims recognized, "the areas beyond the Barnard line (i.e., outside of the present boundaries) were not then of concern to the Court; its attention was turned the other way."  *Yakima Tribe*, 158 Ct. Cl. at 682.  Moreover, *Northern Pacific* did not address or preclude the Nation's boundary claims against the County, just as it did not preclude the Nation's claims against the United States before the ICC.  *Cf. id*. at 681.  Like the ICC, this Court has an opportunity to adjudicate the status of Tract D, which was not at issue in *Northern Pacific*, now with the benefit of the Treaty Map, "which was not before the courts in the *Northern Pacific* litigation." *Id*. at 682.

The Court of Claims' interpretation of *Northern Pacific*, as well as the ICC's ruling on the merits, are particularly persuasive here because of those tribunals' unique charge to "dispose of the Indian claims problem with finality." H.R. Rep. No. 79-1466 at 10.  The Nation and the United States vigorously litigated the Tract D issue for seventeen years, *see, e.g.*, Tr. Ex. 47 at YN 356, and the ICC concluded that including Tract D in the reservation was most consistent with the "intention of the treaty makers," as reflected in the treaty calls and the treaty map, especially in light of the "concession [that] must be made to the understanding of the Indians."  *Id*. at YN 348 (citing *Northern Pacific*, 227 U.S. at 362).  In particular, the ICC found that the Treaty Map "indicate[d] . . . that the reservation boundary was intended to follow the Cascades passing to the south of Mount Adams before turning east," and "show[ed] a boundary which extends a considerable distance due south of Mount Adams."  *Id*. at YN 354-55.  The ICC concluded that the Tract D boundary satisfied the treaty calls and was the intention of the treaty makers because it followed "a distinct spur which runs southerly and easterly from the southern slopes of Mount Adams."  *Id*. at YN 355-56.

20

Although the ICC acknowledged that the spur thus identified was not one from "whence flows the waters of the Klickitat and [Toppenish] Rivers," it did not find that failing determinative because no spur satisfied both characteristics. *Id*. The ICC concluded that the Campbell boundary "was in error," because it was based on the erroneous White Swan Map, *id*. at YN 353, and went so far as to say that "we doubt that the earlier surveys would have been so made if the treaty map had then been available." *Id*. at YN 354. As discussed *infra* Section V, the ICC decision has governed the conduct of the United States and the Nation for half a century. In light of the evident congressional interest in repose, these findings should not be disregarded, even if not binding on this Court.

The County argues that the compensation the Nation received for takings in Tract D means that Tract D was "*not*[] included in the reservation," ECF No. 43 at 49, but this conflates land title ownership with reservation boundaries. *See also id*. at 31 n.20, 42 n.25 (same). That the ICC could grant only money for loss of *title*, which is a possessory interest, must be distinguished from the effect of the ICC's determination of reservation *boundaries*, which are jurisdictional in nature. Indian ownership has been "uncoupled" from Reservation status, *see Solem v. Bartlett*, 465 U.S. 463*,* 468 (1984), and the rule is that "*no matter what happens to title* of individual plots within the area," "[o]nce a block of land is set aside for an Indian reservation . . . *the entire block retains its reservation* status until Congress explicitly indicates otherwise." *Id*. at 470 (emphasis added). As in this case, it often was necessary for the ICC to determine the boundaries of a reservation in order to identify which lands may subsequently have been taken by the United States. Although the ICC could no more correct a flawed survey of reservation boundaries than it could restore title, the resulting compensation to the Nation was for the loss of *title* to the lands (i.e., representing the proceeds from those land sales which should have been deposited into the Treasury for the benefit of the

21

Tribe but were not); the Reservation's exterior boundary remained unchanged. *See Mattz v. Arnett*, 412 U.S. 481, 497 (1973) ("allotment . . . is completely consistent with continued reservation status"); *see also* Tr. Ex. 27 at YN 498 (1968 DOI memorandum).

The 1981 Survey also best comports with the President's 1972 Executive Order, which stated that the 21,000-acre parcel in Tract D was "mistakenly thought to be public land" when made part of the forest reserve, and directed the Secretary of the Interior "to assume jurisdiction over the tract of land … and to administer it for the use and benefit of the Yakima Tribe of Indians *as a portion of the reservation created by the Treaty of 1855*." Tr. Ex. 25 at 2-3 (emphasis added). The President's authority to issue that Executive Order was based on the understanding that the 21,000 acres was within the Reservation, and that President Roosevelt thus lacked authority to "take" reservation lands when he designated them as part of the forest reserve. Tr. Ex. 24 at 4. Therefore, if Tract D is found to be outside the Reservation, it would be at odds with the Executive Order and its legal underpinnings.

## IV.   The 1904 Allotment Act Did Not Modify the Reservation Boundary.

The County argues that the 1904 allotment act changed the boundaries of the Reservation from those established by the 1855 Treaty. ECF No. 43 at 41. But, "when Congress has once established a reservation all tracts included within it remain a part of the reservation until separated therefrom by Congress." *United States v. Celestine*, 215 U.S. 278, 285 (1909). In order to diminish a reservation, Congress's intent to do so must be clear and "expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." *Mattz*, 412 U.S. at 505. The 1904 Act exhibits neither an express intent nor a context consistent with diminishment, nor has it ever been considered to have that effect by Congress itself, the Supreme Court, the ICC, or the Attorney General. *See also*

Tr. Ex. 107 at 20- 24 (Defs.' Response to Interrogatories) (County Defendants conceding that nothing in the statute's text or surrounding historical circumstances suggest congressional intent to diminish the Reservation).

When Congress intended to establish and conclusively define an Indian reservation boundary, it did so explicitly.  For example, with the Warm Springs Reservation—which, like the Yakama Reservation, was established pursuant to an 1855 Treaty and became the subject of disputed surveys—Congress expressly declared: "That the true north boundary line of the Warm Springs Indian Reservation . . . is hereby declared to be that part of the line run and surveyed by T.B. Handley . . . ."  28 Stat. 86 (1894); *see also Chickasaw Nation v. United States*, 94 Ct. Cl. 215, 221 (1941) (discussing statute that declared "the boundary line between the State of Arkansas and the Indian country, as originally surveyed and marked … is hereby declared to be the permanent boundary between the State of Arkansas and the Indian country").  In other words, Congress knew how to definitely declare a disputed reservation boundary.

But in the 1904 Yakama allotment act, Congress merely recognized the Nation's then-existing claim to 293,837 acres west of the Schwartz line, saying that "said tract shall be regarded as part of the Yakima Indian Reservation for the purposes of this Act . . . ."  33 Stat. 595, 596.  In other words, lands within this tract could be allotted to tribal members or sold as surplus lands.  Although the 1904 Act did not address allotment and sale within Tract D, that omission falls well short of demonstrating clearly and unambiguously that the Reservation established by the 1855 Treaty was thereby shrunk to the Barnard line.

The surrounding circumstances and legislative history make equally clear that Congress's intent was to specify which lands were to be allotted and soften the blow of opening the Reservation against the Nation's wishes—not to establish a southwestern boundary or lay to rest any dispute as to the western boundary.

The House report accompanying the 1904 Act laments the failure to open the Reservation as "a very great hindrance to the continued and complete development of [Yakima County and the State of Washington]" and states the pressing sense of the House that "this reservation should be opened at once." Tr. Ex. 20 at 5. But "one of the principal obstacles in the way of securing an agreement with the Yakimas [to open the reservation] was that relating to the adjustment of this boundary dispute." Tr. Ex. 76 at 5; S. Doc. No. 337, 63rd Cong., 2d Sess. at 155-156 (Dec. 20, 1913) (testimony of B.F. Barge, member of the Flathead-Crow Commission, that the "main difficulty" preventing an agreement for the disposition of surplus lands "was a disputed boundary"). DOI officials recommended Congress "provid[e] for the adjustment of this claim of the Indians for the lands which have been cut off the western portion of their reserve," whether or not negotiations continued for the cession of lands more broadly. Tr. Ex. 76 (at 5). By agreeing to the Nation's claim on the western boundary, Congress neutralized one objection to its decision to open the Reservation over the protest of the Tribe. *See*, *e.g.*, Tr. Ex. 19 at 5783 (House Debate on 1904 Act) (Rep. Sulzer) ("Everybody seems to be in favor of these bills to take away the lands of the Indians but the Indians.").

The notion that the 1904 Act diminished the Yakama Reservation has been explicitly and implicitly rejected on multiple occasions over the last ninety years. The Supreme Court in *Northern Pacific* considered the Treaty in evaluating the western boundary of the Reservation, but did not appear to find the 1904 Act relevant to its analysis. 227 U.S. at 359-66. This proposition was expressly rejected in 1932, when a senior DOI official explained in a letter to the Attorney General that the 1904 statute "specifically relates to the sale and disposition of the surplus or unallotted lands of the Yakima Reservation" and "fails to show anything which could be construed as finally fixing the boundary of the

24

reservation or in any way presenting an obstacle to the claim of the Indians for additional land." Tr. Ex. 52 at KC 820. In 1939, after the Treaty Map was discovered, Congress itself demonstrated that the 1904 Act did not resolve the boundary dispute by appropriating funds for the "completion of a survey of the disputed boundary of the Yakima Reservation." 53 Stat. 685, 696 (1939). Nor did the ICC find the 1904 Act dispositive of the boundary questions before it. *See supra* at Section III.

Finally, the Attorney General could not have concluded in 1972 that the President could return 21,000 acres in Tract D to the Yakama Nation if the 1904 statute was viewed as congressional diminishment of the Yakama Reservation and establishment of a reservation boundary. If that were the case, the 21,000-acre parcel would *not* have been within the Reservation at the time of the 1907 Proclamation reserving the lands for the forest system, and the land could not have been simply returned to the Tribe through Executive action, as the Attorney General concluded was permissible. *See* Tr. Ex. 24 at 6. But although the Attorney General noted that the 1904 statute "recognize[d] the 1899 survey, on the basis of then available evidence," *id.* at 3, he did not conclude that this statute altered the Treaty boundary.

## V.   For More Than Fifty Years, Federal Agencies Have Consistently Treated Tract D as Within the Reservation.

Since the discovery of the Treaty Map, federal agencies have generally treated Tract D as within the Reservation. This conclusion was reflected in the 1932 Calvin survey, see *supra* at pages 8-9, and in the views of federal officials expressed throughout the 1930s. *See, e.g.*, Tr. Ex. 37 at KC 1702-03; Tr. Ex. 52 at KC 825; Tr. Ex. 54 at KC 784. Following the ICC decision, DOI's Office of the Regional Solicitor provided an extensive analysis of jurisdiction in Tract D. *See* Tr. Ex. 27. That memorandum concluded that the Yakama Tribe had not lost or

25

ceded jurisdiction over Tract D lands. *Id.* at YN 494. Thus, "until the boundaries of the reservation are changed by congressional action, the land within Tracts C and D remains a part of the Yakima Reservation," and the Tribe retains authority over its members and treaty rights in this area. *Id.* at YN 498.

Since then, this conclusion has been reiterated by DOI officials on multiple occasions. For example, in 1978, Interior Solicitor Leo Krulitz confirmed to Representative Mike McCormack that the town of Glenwood is within the Yakima Indian Reservation. Tr. Ex. 28 at YN 519. Solicitor Krulitz explained that "notwithstanding the diminution of [the Yakama Nation's] ownership of lands within their reservation, their governmental authority persists." *Id.* In 1980, the Office of the Regional Solicitor confirmed again that Tract D remained part of the Reservation, and that removal or destruction of boundary signs was prohibited by federal law. Tr. Ex. 30. The status of Tract D as within the Reservation was confirmed again by DOI officials in 1986 in a letter to the Chairman of the Yakima Tribal Council, Tr. Ex. 83, and in 1992 by Solicitor Tom Sansonetti to Representative Sid Morrison. Tr. Ex. 31; *see also* Tr. Ex. 87 (1993 BIA Letter to Representative Inslee).

DOI's operations also reflect this reality. For example, in 1980, the Yakama Nation purchased approximately 180 acres of land within Tract D using funds from the Department of Agriculture Farmers Home Administration Direct Loan Account, which authorizes purchase of lands "within the tribe's reservation as determined by the Secretary of the Interior." *See* Pub. L. 91-229 (Apr. 11, 1970); Shaw Decl., Exs. E-F. The Yakama Nation purchased an additional 64 acres of land using this program and the Secretary of the Interior took those lands into trust in 1985. Shaw Decl., Exs. G-H.

Since 1972, DOI's Bureau of Indian Affairs (BIA) Forestry Program has managed approximately 22,000 acres of lands in Tract D in compliance with

26

federal statutes and regulations concerning Indian timberlands.  BIA's Forestry Program also maintains an office in Glenwood, and has facilitated on-reservation timber sales in Tract D since 1987, harvesting over 111,000,000 board-feet of tribal timber and generating approximately $16,882,770 in revenue for the Yakama Nation.  *See* Shaw Decl. ¶¶ 12-13.

The U.S. Environmental Protection Agency ("EPA") has also treated Tract D as within the Reservation.  EPA retains authority to implement certain environmental statutes on lands within the limits of any Indian reservation, notwithstanding the issuance of any fee patents. *See, e.g.*, 40 C.F.R § 49.2(b) (defining reservation for purposes of Clean Air Act (CAA) authority); *id.* § 122.2 (Clean Water Act (CWA) authority).  EPA has asserted its regulatory authority throughout the Yakama Reservation, including within Tract D.  For example, in 2003, EPA sent a letter to Public Utility District No. 1 of Klickitat County relating to a notice of violation to the wastewater facility in Glenwood regarding unpermitted discharges in violation of CWA.  Tr. Ex. 41.  EPA stated that it "understands the clear position of the United States is that the Glenwood facility and other lands within 'Tract D' are within the boundaries of the Yakama Indian Reservation." *Id.* (also noting that the Washington Department of Ecology maintains that Glenwood is within the Reservation).  A 2005 letter from EPA to Klickitat County makes the same conclusion about reservation status in the context of whether Washington's CAA State Implementation Plan applies in Tract D, since such plans do not apply within Indian reservations.  Tr. Ex. 42.  EPA also directly implements the Resource Conservation and Recovery Act Subtitle I

27

program within Indian County, and has asserted authority over underground storage tanks in Glenwood, within Tract D.[3]

## VI. Affirming the Treaty Boundary as Including Tract D Would Not Cause Significant Jurisdictional Changes for Residents of that Area.

Like most reservations, the Yakama Reservation, including Tract D, and specifically the community of Glenwood, contains a mix of Indian and non-Indian residents, and the land includes both non-Indian owned fee land and land held in trust by the United States for the Tribe and its members. Affirming the federal government's longstanding view that Tract D is part of the Reservation will not cause any significant disruptions to the residents of that area, or significantly affect jurisdictional practices there. Tract D remains part of the State of Washington, and state laws will continue to apply to most transactions on fee land involving non-Indians. *See, e.g.*, *Nevada v. Hicks*, 533 U.S. 353, 362 (2001). States have jurisdiction over non-Indians on reservations unless such jurisdiction is preempted by federal law or would unlawfully infringe "on the right of reservation Indians to make their own law and be ruled by them." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142-43 (1980). In contrast, tribes have more limited authority over non-Indians within reservations, particularly on non-Indian fee land. *Plains Com. Bank v. Long Family Land and Cattle Co.*, 554 U.S. 316, 327-28 (2008).

In particular, state laws will generally continue to apply to nonmember activities on fee lands in matters as diverse as liquor sales, *see Rice v. Rehner*, 463 U.S. 713 (1983); zoning and building regulation, *see Brendale v. Confederated Bands and Tribes of the Yakima Nation*, 492 U.S. 408 (1989), and most business

---

[3] *See* https://www.epa.gov/sites/production/files/2019-02/r10-ust-lust-10-17-18.xlsx.

28

regulation, *see, e.g. Montana v. United States*, 450 U.S. 544, 565-66 (1981) (addressing when tribes may regulate nonmember activity on fee lands). It also seems unlikely that State or County taxation authority would be significantly affected, since states also may generally collect nondiscriminatory taxes on sales to non-Indians, even by certain Indian businesses, unless otherwise preempted. *See, e.g.*, *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134 (1980). Klickitat County appears to collect real property taxes assessed on non-Indian-owned fee lands throughout the County—including within Tract D—as well as other tax levies on behalf of the County and on behalf of junior taxing districts. *See* Tr. Exs. 580, 583. It is not clear why the County's receipt of these revenues, or County services, would change based on judicial confirmation of reservation status. *See, e.g.*, *County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation*, 502 U.S. 251 (1992).

As to criminal jurisdiction, Indian country status is irrelevant to jurisdiction over crimes between non-Indians, *e.g.*, *United States v. Antelope*, 430 U.S. 641, 643 n. 2 (1977), and the State of Washington maintains certain civil and criminal jurisdiction within the boundaries of the Yakama Reservation. *See generally Yakima Indian Nation*, 439 U.S. at 465-66; *Confederated Tribes and Bands of the Yakama Nation v. City of Toppenish*, No. 18-3190 (E.D. Wash. Feb. 22, 2019). The federal government also has criminal jurisdiction over offenses involving Indians within reservations pursuant to the General Crimes Act, 18 U.S.C. § 1152, and the Major Crimes Act, *id.* § 1153. Tribes retain jurisdiction over "offenses committed by one Indian against the person or property of another Indian," *id.* § 1152, but the Major Crimes Act provides for federal jurisdiction over an Indian who has committed, in Indian country, enumerated serious crimes, whatever the status of the victim. *Id.* § 1153. The federal Juvenile Justice and Delinquency Act, 18 U.S.C. § 503, extends federal jurisdiction over juvenile defendants in

29

these cases, and the Assimilative Crimes Act, 18 U.S.C. § 13, empowers the federal government to fill any gaps in federal criminal law with laws from the state where the federal land is situated.  As a result, and particularly given the small population of Tract D, the United States does not anticipate any gaps in the ability of the various jurisdictions to enforce criminal laws in this area.  However, if jurisdictional disputes arise regarding any of these matters, tribes, state, and municipalities frequently negotiate intergovernmental agreements, such as cross-deputization agreements, to address these issues.  *See, e.g. Hicks*, 533 U.S. at 393 (noting the "host of cooperative agreements between tribes and state authorities").

Thus, the affirmation that Tract D is a part of the Yakama Indian Reservation is unlikely to have significant effects on the residents of that area, and any jurisdictional overlap or disputes could be resolved between the State, County, and Tribe, as appropriate.

## CONCLUSION

For the foregoing reasons, the Court should find that the 1981 Survey, which includes Tract D, represents the southwestern boundary of the Yakama Indian Reservation.

Respectfully submitted,

JEFFREY BOSSERT CLARK
Assistant Attorney General

___s/ Daron Carreiro___
Amber Blaha
Daron Carreiro
Christine Ennis
Environment and Natural Res. Div.
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-5331
Email: amber.blaha@usdoj.gov
daron.carreiro@usdoj.gov
christine.ennis@usdoj.gov

JUNE 13, 2019

30

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 13, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice.

s/ Daron Carreiro
Daron Carreiro
U.S. Department of Justice
Environment and Natural Res. Div.
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-5331
Email: daron.carreiro@usdoj.gov

31