UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| THE CONFEDERATED TRIBES AND BANDS OF THE YAKAMA NATION, a sovereign federally recognized Native Nation, | NO. 1:17-CV-3192-TOR |
| | FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECLARATORY JUDGMENT |
| Plaintiff, | |
| v. | |
| KLICKITAT COUNTY, a political subdivision of the State of Washington; KLICKITAT COUNTY SHERIFF'S OFFICE, an agency of Klickitat County; BOB SONGER, in his official capacity; KLICKITAT COUNTY DEPARTMENT OF THE PROSECUTING ATTORNEY, an agency of Klickitat County; and DAVID QUESNEL, in his official capacity, | |
| Defendants. | |

A bench trial was held from July 29 to 31, 2019. Plaintiff Confederated

Tribes and Bands of the Yakama Nation ("Yakama Nation") was represented by

Mr. Ethan A. Jones and Ms. Shona Voelckers from the Yakama Nation Office of Legal Counsel, and Mr. R. Joseph Sexton from the firm Galanda Broadman, PLLC.  Defendants Klickitat County, Klickitat County Sheriff's Office, Klickitat County Sheriff Bob Songer, Klickitat County Department of the Prosecuting Attorney, and Prosecuting Attorney David Quesnel, were represented by Mr. Timothy J. Filer and Mr. Rylan L. S. Weythman from the firm Foster Pepper PLLC, Mr. David R. Quesnel and Ms. Rebecca N. Sells from the Klickitat County Department of the Prosecuting Attorney, and Ms. Pamela B. Loginsky from the Washington Association of Prosecuting Attorneys.  The United States and the State of Washington participated as *amici curiae*, filing briefs with the Court at ECF Nos. 76 and 100.

## DISPUTE

In 1930, seventy-five years after the Treaty signing, Moses Sampson succinctly summarized the primary problem now before the Court: "its too bad that all the old people who knew are dead."  Ex. 550 at 1.

The Yakama Nation contends that Klickitat County Defendants violated and continue to violate the Treaty with the Yakamas of 1855 (12 Stat. 951) and the Yakama Nation's inherent sovereign rights by exercising criminal jurisdiction over Yakama members for alleged crimes occurring within the Yakama Reservation, and in particular in an area known as Tract D.  The Yakama Nation seeks

declaratory relief affirming that (1) the Yakama Nation Treaty negotiators would have naturally understood the Yakama Reservation's boundary described in the Treaty of 1855 to include Tract D, (2) Congress has not acted to change the Yakama Reservation's boundaries set forth in the Treaty of 1855, (3) the Yakama Reservation's southwestern boundary between Mount Adams and Grayback Mountain follows the lines surveyed and reported by Ronald Scherler in 1982, which includes Tract D within the Yakama Reservation, and (4) Defendants do not have criminal jurisdiction over Indians within the Yakama Reservation.

The Klickitat Defendants assert that Tract D is not, and never has been, part of the Yakama Reservation. First, they contend the Yakama Nation cannot carry its burden of proving that the parties to the Treaty of 1855 intended Tract D to be included in the reservation. Second, they contend Congress expressly settled the disputed western boundary in 1904, adopting a boundary that does not include Tract D within the reservation, which boundary is still in effect. Accordingly, Defendants assert that Klickitat County maintains full jurisdiction within the Klickitat County portion of Tract D, and has jurisdiction within the exterior boundaries of the reservation consistent with this Court's Order Denying Plaintiff's Motion for Preliminary Injunction (ECF No. 58) and *State v. Zack*, 2 Wash. App. 2d 667, *review denied*, 191 Wash. 2d 1011 (2018).

//

## JURISDICTION AND STANDING

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1362, and under federal common law because the Yakama Nation asserts claims arising under the Treaty of 1855. The Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. § 2201, and other relief—including injunctive relief—pursuant to 28 U.S.C. § 2202.

Plaintiff alleges that Defendants' assertion of criminal jurisdiction over crimes within the Yakama Nation involving Indians, following the United States' acceptance of Washington's retrocession, constitutes a violation of the Yakama Nation's sovereignty. Thus, "[t]he injury that the Yakama Nation has sustained, and will continue to sustain without injunction, is a violation of its sovereign legally protected rights." Defendants do not dispute that they asserted criminal jurisdiction over Yakama members within Tract D following retrocession, nor do they deny that they will continue to exercise such jurisdiction in the future. To the contrary, Defendants maintain that they should not be prevented, by Plaintiff or this Court, from enforcing state criminal laws within the county as Tract D is not within the Yakama Reservation.

The Court finds that actual infringement of the tribe's sovereignty, as alleged by Plaintiff in this case, establishes "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not

conjectural or hypothetical." *Lujan*, 504 U.S. at 560. A tribe has a legal interest in protecting tribal self-government from a state's allegedly unjustified assertion of criminal jurisdiction over Indians and Indian Country. Congress, too, has a substantive interest in protecting tribal self-government. *See Moe v. Confederate Salish and Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 469 n.7 (1976). Accordingly, the Defendants' exercise of criminal jurisdiction over Yakama members within Tract D, if within the Reservation, would constitute an affront to sovereignty sufficient to confer standing. Plaintiff has alleged facts from which the Court could reasonably infer concrete, particularized, and actual or imminent injury. *See Lujan*, 504 U.S. at 560.

The Court finds that Plaintiff also satisfies Article III's remaining requirements—plaintiff's injury-in-fact is "fairly traceable" to the "complained-of-conduct of the defendant," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998), and a favorable ruling would likely redress plaintiff's injury. *Lujan*, 504 U.S. at 561. As noted, Defendants confirm that they exercised criminal jurisdiction over Yakama members within Tract D and do not deny their intent to continue exercising criminal jurisdiction within Tract D because they contend it is not within the Yakama Reservation. An declaratory judgment or injunction preventing Defendants from exercising criminal jurisdiction would unquestionably prevent further alleged violations of the Yakama Nation's sovereignty.

Accordingly, the Court finds that Plaintiff has satisfied Article III's standing requirements.

## UNDISPUTED FACTS

The parties agreed upon the following facts (ECF No. 90 at 3-4), which the Court accepts without further proof:

1.      For the purposes of this case, the boundaries of the area of land referred to as 'Tract D' are those surveyed by E.D. Calvin in 1932, and by Ronald Scherler in 1982, within which there are approximately 121,465.69 acres.  Not all of Tract D falls within Klickitat County.

2.      The Confederated Tribes and Bands of the Yakama Nation and the United States are parties to the Treaty with the Yakamas of June 9, 1855, codified at 12 Stat. 951 ("Treaty of 1855").

3.      The Treaty of 1855 established the Yakama Reservation.

4.      Article II defines the Yakama Reservation's intended boundaries, in relevant part, as follows:

> "thence southerly along the main ridge of said mountains, passing south and east of Mount Adams, to the spur whence flows the waters of the Klickatat and Pisco rivers; thence down said spur to the divide between the waters of said rivers; thence along said divide to the divide separating the waters of the Satass River from those flowing into the Columbia River . . ."

5.     The present southern boundary of the Yakama Reservation, east of Grayback Mountain, is represented by the boundary surveyed by Berry and Lodge in 1861.

6.     The map entitled "A Sketch Showing The Cayuse Walla Walla Yakama And Nez Perce Purchases and Reservations" dated June 12, 1855 and signed by Territorial Governor Isaac I. Stevens ("Treaty Map") was present at the Walla Walla Treaty Council.

7.     The original Treaty Map was lost in the United States' records until approximately 1930.

8.     The State of Washington has retroceded to the United States of America certain portions of jurisdiction within the exterior boundaries of the Yakama Reservation that the State had previously assumed under Pub. L. 83-280. This lawsuit was commenced after Klickitat County arrested and charged a minor for criminal acts arising within Tract D to which the minor subsequently pled guilty.

9.     The Indian Claims Commission ("ICC") lacked jurisdiction to change reservation boundaries. The ICC could not and did not alter the boundaries of the Yakama Reservation.

//

//

## SPECIFIC FINDINGS AND CONCLUSIONS

Having heard the evidence, including expert testimony, and reviewed the exhibits admitted into evidence, the Court "find[s] the [following] facts specially and state[s] its conclusions of law separately" according to Federal Rule of Civil Procedure 52(a)(1). These factual findings are based at a minimum upon a preponderance of the evidence and oftentimes on clear and convincing or uncontroverted evidence.

10. The Court accepts the expert opinions of Dr. Andrew Fisher. Dr. Fisher's reasoning and justification, citation to important pieces of evidence in the record and thoughtful approach are compelling and accepted. Dr. Fisher, unlike expert witness Michael Reis, looked at the entire historical record and came to reasoned and fair opinions; he is credible.

11. For millennia, indigenous groups that later became the fourteen Tribes and Bands which were confederated as the Yakama Nation lived and traveled throughout the Pacific Northwest for hunting, fishing, gathering roots and berries, trading, and other purposes.

12. The Klickitats and Yakamas used the lands in and around Tract D which they called Táak or Tahk [Plain] (now known as Camas Prairie) as a source of essential foods, camas roots, wápp-a-too (a tuber producing plant like potatoes, probably *Sagittaria latifolia*), salmon fishing and as a communal gathering place.

Every year, women and children dug up and baked the roots and camas bulbs and gathered berries, while the men hunted and fished in the area. Táak's flat and grassy meadows were an ideal location where multiple tribes and bands came together annually to trade, socialize, gamble, and race horses.

13.     The cultural and sustenance values of Táak, as well as the need to protect it from euro-American encroachment, were recognized by federal representatives prior to the Treaty of 1855. When traveling through the area in 1853 for a railroad survey, ethnographer George Gibbs noted the Klickitat and Yakama Bands' annual festivities there. In 1854, federal sub-agents recommended Camas Prairie be reserved "as soon as possible" because of the necessary foods the area provided, and the likelihood that early settlers—if allowed—would destroy the valuable roots that were then plentiful within Camas Prairie.

14.     In May and June of 1855, the Yakama Nation's representatives gathered at the Walla Walla Treaty Council to negotiate the Treaty of 1855 with Isaac I. Stevens, the Governor and Superintendent of Indian Affairs for the Territory of Washington.

15.     The federal Indian law canons of Treaty construction provide that "Indian treaties 'must be interpreted in light of the parties' intentions, with any ambiguities resolved in favor of the Indians' and the words of a treaty must be construed 'in the sense in which they would naturally be understood by the

Indians[.]'"  *Herrera v. Wyoming*, 139 S.Ct. 1686, 1699 (2019) (citations omitted); *Jones v. Meehan*, 175 U.S. 1, 11 (1899) ("the treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians.").

16.     The Supreme Court has repeatedly stressed that the language of the Treaty "should be understood as bearing the meaning that the Yakamas understood it to have in 1855." *Wash. State Dep't of Licensing v. Cougar Den, Inc.*, 139 S.Ct. 1000, 1011 (2019).

17.     Three important pieces of evidence chronicle what happened at the Treaty Council: the Treaty of 1855 (Ex. 6), the contemporaneously executed map (the "Treaty Map") (Ex. 55; Ex 56 (a 1939 reproduction of original Treaty Map)), and the official minutes from the Treaty Council ("Treaty Minutes") (Ex. 32).

18.     The Treaty Minutes are the best evidence remaining of what occurred and what Governor Stevens told the Yakama Nation's representatives during Treaty negotiations at the Walla Walla Treaty Council.

19.     The Yakama Nation's representatives present at the Walla Walla Treaty Council did not speak English, so several interpreters were present to translate for the parties.

20.    The Yakama Nation's representatives did not understand western cartography or the meaning of latitude and longitude nor is there any evidence that these concepts were explained to them.

21.    The Yakama Nation's representatives, including the signatories to the Treaty of 1855, could not read the Treaty of 1855.

22.    Before the Treaty of 1855 was signed, Governor Stevens told the Yakama Nation's representatives that the Yakama Reservation's western boundary would extend "to the Cascade mountains, thence down the main chain of the Cascade mountains south of Mount Adams, thence along the Highlands separating the Pisco and the Sattass river from the rivers flowing into the Columbia. . ." Ex 32 at 65.  Governor Stevens said, ". . . here is the paper for the Yakamas. . . your lands are described.  We got the descriptions from yourselfs (sic).  Then your reservations are pointed out, those you all know." *Id*. at 100.  Governor Stevens then stated that the treaties had been read over not once, but two or three times. *Id*. at 101.

23.    The Treaty Map was present at the Walla Walla Treaty Council and used by Governor Stevens to communicate the reservation boundaries.

24.    The Treaty Map depicts the Yakama Reservation's western boundary as passing along the main ridge of the Cascade Mountains in a southerly direction

west of Mount Adams, and then south of Mount Adams for a distance before turning east along the Yakama Reservation's southern border. Ex. 55.

25. In Article I of the Treaty, the Yakama Nation ceded certain rights to more than 10 million acres of land, roughly one fourth of the State of Washington, for the rights reserved in the Treaty.

26. The Treaty of 1855 established the Yakama Reservation. In Article II of the Treaty, the Yakama Nation reserved from the ceded lands a tract of land included within the following boundaries, to wit:

> Commencing on the Yakama river, at the mouth of the Attah-nam River; thence westerly along said Attah-nam River to the forks; thence along the southern tributary to the Cascade Mountains; thence southerly along the main ridge of said mountains, passing south and east of Mount Adams, to the spur whence flows the waters of the Klickitat and Pisco Rivers; thence down said spur to the divide between the waters of said rivers; thence along said divide to the divide separating the waters of the Satass River from those flowing into the Columbia River; thence along said divide to the main Yakama, 8 miles below the mouth of the Satass River; and thence up the Yakama River to the place of beginning.
>
> All which tract shall be set apart, and, so far as necessary, surveyed and marked out, for the exclusive use and benefit of said confederated tribes and bands of Indians, as an Indian reservation . . .

Ex. 6; Treaty between the United States and the Yakama Nation of Indians, 12 Stat. 951, Concluded at Camp Stevens, Walla-Walla Valley, June 9, 1855; Ratified by the Senate, March 8, 1859; Proclaimed by the President of the United States, April 18, 1859.

27.     The Treaty of 1855's description of the Yakama Reservation is ambiguous in its call for a southwestern boundary that follows a spur and divide separating the Klickitat River from the Pisco River (i.e. Toppenish Creek) because these features do not exist between said rivers south of Mount Adams.

28.     Applying the canons of treaty construction, the Yakama Nation would have naturally understood the Treaty of 1855 to include Tract D within the Yakama Reservation.

29.     In all the years following execution of the Treaty, boundary disputes arose in multiple areas of the Yakama Reservation.  Unfortunately, the Treaty Map was quickly lost in the Government's files until it was finally recovered nearly seventy-five years later, in 1930.  These disputes prompted a number of erroneous federal surveys that further complicated the historical record.

30.     Congress passed the Indian General Allotment Act in 1887 (also known as the Dawes Act), which empowered the President to allot land to individual Indians without their consent and allowed non-Indians to purchase un-allotted lands.  In 1897, a federal commission, known as the Crow-Flathead Commission, attempted to convince the Yakama Nation to approve the sale of unallotted lands within the Reservation.  Ex. 17.  The Yakama Nation refused, citing outstanding Reservation boundary errors.  *Id.*

31.     In 1890, George A. Schwartz's survey failed to properly identify the Yakama Reservation's western boundary by excluding almost half of the Reservation.  The Yakama Nation rejected the Schwartz survey, prompting the United States to task Geological Survey Topographer E. C. Barnard with investigating the boundary.

32.     Barnard used the White Swan Map, an inaccurate reproduction made by Governor Stevens of the lost Treaty Map.  In 1900, even with this inaccurate map, Barnard's report concluded that the Schwartz Survey incorrectly excluded some 357,878 acres in the western portion of the Yakama Reservation.

33.     In reviewing the southwestern boundary of the Reservation, Barnard relied on a conversation with Stick Joe and Chief Spencer, both enrolled Yakama Nation members, who recounted an erroneous boundary between Mount Adams and Grayback Mountain that had been described to them by federal agents years after the Treaty was signed.

34.     Abraham Lincoln, also an enrolled Yakama Nation member and line rider, identified this erroneous boundary to Barnard, as well.

35.     Neither Stick Joe, Chief Spencer nor Abraham Lincoln were present at the Walla Walla Treaty Council, saw the Treaty Map, nor were told the boundaries by Tribal headmen present at the Treaty Council.  Only federal agents

told them where the boundaries were, years after the Treaty was signed, which they later repeated to others.

36.     Despite what his name implies, Chief Spencer was not a chief of the Yakama Nation that could individually speak for the entire Tribe.  Neither Stick Joe nor Abraham Lincoln represented the entire Tribe.

37.     The straight lines that Barnard drew in his report were inconsistent with the erroneous boundaries Stick Joe, Chief Spencer, and Abraham Lincoln recounted, creating further confusion in the different Yakama Reservation boundaries advocated by the federal government at that time.

38.     The Department of Interior then reduced Barnard's calculation and at that time, only recognized an additional 293,837 acres beyond what Schwartz had surveyed.

39.     Only Congress can diminish an Indian reservation's boundaries, and its intent to do so must be clear.  *Nebraska v. Parker*, 136 S.Ct. 1072, 1078-79 (2016).

40.     This Court assesses whether an Act of Congress diminished an Indian reservation by first reviewing the statutory text, for the most probative evidence of diminishment is the statutory language used to open the Indian lands.  *See Parker*, 136 S.Ct. at 1079.

41.     Where the statutory text does not clearly evince a congressional intent to diminish an Indian reservation, this Court next reviews the history surrounding the passage of the Act of Congress for evidence that unequivocally reveals a widely held, contemporaneous understanding that the Indian reservation would shrink as a result of the legislation.  *See Parker*, 136 S.Ct. at 1080.

42.     This Court also reviews the subsequent demographic history of the opened lands to reinforce a finding of diminishment or non-diminishment based on the statutory text, although this consideration cannot, alone, support a finding of diminishment.  *See Parker*, 136 S.Ct. at 1081.

43.     On December 21, 1904, Congress passed a surplus lands act for the Yakama Reservation ("1904 Act"), titled "To authorize the sale and disposition of surplus or unallotted lands of the Yakima Indian Reservation, in the State of Washington."  In the 1904 Act, Congress instructed the Secretary of the Interior to treat the 293,837 acres included by Barnard and approved by Interior as part of the Yakama Reservation "for the purposes of this Act . . . "  33 Stat. 595.  Congress expressly proclaimed "it being the purpose of this Act merely to have the United States to act as trustee for said Indians in the disposition and sales of said lands and to expend or pay-over to them the proceeds derived from the sales as herein provided."  *Id.*

44.     "Such schemes allow 'non-Indian settlers to own land on the reservation.'  But in doing so, they do not diminish the reservation's boundaries." *Parker*, 136 S.Ct. at 1080 (internal citation omitted).

45.     The 1904 Act did not change the Treaty boundaries of the Yakama Reservation and did not effectuate a diminishment of the Reservation.  The legislative history, plain language of the text, and subsequent history do not support any finding that Congress intended to diminish the Reservation.

46.     Indeed, Congress continued to acknowledge the boundary dispute and in 1939 appropriated funds "[f]or completion of a survey of the disputed boundary of the Yakima Reservation, Washington . . ."  53 Stat. 685, 696.

47.     Testimony and evidence concerning the present-day effect of recognizing Tract D as within the Reservation boundaries is irrelevant to the determination of what the parties agreed upon in the Treaty of 1855 and does not support a finding of Congressional diminishment.

48.     During the Congressional hearing on the 1904 Act, Representative Wesley Jones of Washington confirmed that the Yakama Nation did not agree with the Act and explained the intent of the bill was "to help provide for the better disposition of the Indian" and "to be fully protecting the Indians in all their rights . . . ."  Representative Jones then reaffirmed the intent of the bill, stating "I can not

conceive of a bill that would be fairer or more just to the Indians . . . I believe it is one of the fairest bills for the Indians that has ever been presented in this House."

49.     The House of Representatives Committee on Indian Affairs stated that the Yakama Nation Reservation "is a very great hindrance to the continued and complete development of that country.  With so large a body of land as that held from settlement and cultivation, settlement and growth can not help but be retarded.  We believe it to be very important that this reservation should be opened at once."  Ex. 20 at 5 (1904, Committee on Indian Affairs Report No. 2346).

50.     After Congress passed the surplus lands act for the Yakama Reservation in 1904, the Campbell, Germond, and Long Survey marked the extent of the impacted land (referred to as the Barnard / Campbell Line).  This survey reflected three straight boundary lines of the Reservation that excluded land in the northwest, west, and southwest areas of the Reservation.

51.     For the benefit of the Yakama Nation, the United States brought suit to annul railroad patents issued outside the Schwartz survey but within the Barnard / Campbell Line, which suit ultimately reached the Supreme Court.  *N. Pac. Ry. Co. v. United States*, 227 U.S. 355 (1913).  The Supreme Court affirmed the Circuit Court of Appeals and Circuit Court which cancelled the railroad patents between these surveys.  *Id*. at 358, 367.

52. The Supreme Court decision in *N. Pac. Ry. Co.* did not establish the reservation boundaries once and for all, but rather only decided whether the railroad patent claims between two competing boundary lines were valid.

53. Following the Supreme Court's decision in the Northern Pacific Railway Company case, the United States engaged Charles Pecore to survey the Yakama Reservation's western boundary. Pecore's survey, accepted by the General Land Office in 1926, recognized an additional 47,593 acres in a triangular shape on the Reservation's southwestern boundary, but it too failed to follow natural features and the language of Article II of the Treaty.

54. In 1930, the United States found the original Treaty Map, after it was lost in the Department of the Interior's files for nearly seventy-five years.

55. In 1932, with the benefit of the Treaty Map, the United States tasked Elmer D. Calvin of the General Land Office to resurvey the southwestern Reservation boundary. The Calvin Survey confirmed a natural spur divide south of Mount Adams along the main ridge of the Cascade Mountains between the watersheds of the White Salmon River and Klickitat River that best represented the Treaty's boundary description and which encompassed Camas Prairie and all of Tract D.

56. As called for in the Treaty, a spur divide between the Klickitat River watershed and the Pisco River (i.e., Toppenish Creek) watershed does not exist

south of Mount Adams, but this spur divide located by the Calvin Survey best fulfills the Treaty's boundary description.

57.     In 1933, Topographic Engineer F. Marion Wilkes of the Office of Indian Affairs, Department of Interior, fully supported the Calvin Survey as correctly interpreting the calls of the Treaty when read in conjunction with viewing the Treaty Map.  Ex. 59.

58.     In 1949, the Yakama Nation filed claims with the Indian Claims Commission ("ICC") seeking compensation for Yakama Reservation land that the United States patented to non-Indians without compensation to the Yakama Nation, including lands within Tract D.

59.     Eventually, in 1966, the ICC determined that Tract D, as surveyed by Mr. Calvin, was intended to be included within the Yakama Reservation and therefore the Yakama Nation's claim to compensation was granted.

60.     In 1968, the ICC approved a settlement with the United States paying the Yakama Nation $2.1 million for the 97,908.97 acres that were patented to others within the 121,465.69 acres that comprise Tract D.

61.     Since the ICC proceedings, the federal government has uniformly taken the position that Tract D lies within the boundaries of the Yakama Reservation.  The United States' amicus curiae brief continues to recognize this

now longstanding position.  ECF No. 76.  Of course, the United States is the only other party to the Treaty of 1855 with the Yakama Nation.

62.     In 1972, President Nixon returned possession of 21,008.66 acres that the United States had erroneously made part of the Gifford Pinchot National Forest situated in the northwest corner of Tract D surrounding Mount Adams.  Ex. 25; Executive Order 11670.  President Nixon's executive order acknowledged that this land was part of the Yakama Reservation created by the Treaty of 1855.

63.     From 1978 to 1981, United States Bureau of Land Management Cadastral Surveyor Ronald Scherler surveyed the southwestern boundary of Tract D which he marked with iron posts and brass caps.  The United States Chief Cadastral Surveyor of Washington approved Scherler's survey in 1982.

64.     Tract D, as surveyed by Cadastral Engineer Ronald Scherler and approved by the United States in 1982, is located within the exterior boundaries of the Yakama Reservation established by the Treaty of 1855.  Scherler's survey marks the correct southwestern boundary of the Yakama Nation Reservation.

65.     The Bureau of Land Management is authorized by Congress to survey Indian reservations.  25 U.S.C. § 176.  The Bureau of Land Management has the authority to correct erroneous public land surveys.  43 U.S.C. § 772.  The United States' corrected survey performed by Scherler, accepted and approved by the

United States in 1982, reflects the correct southwestern boundary of the Yakama Nation Reservation.

66.     Mr. Reis' analysis is flawed and ignores important historical events and critical pieces of evidence to come to a skewed conclusion that Tract D is not part of the Yakama Reservation.  The Court rejects Mr. Reis' analysis and conclusions.

67.     For instance, Mr. Reis relies heavily on the statements of Stick Joe and Chief Spencer, neither of whom attended the Treaty signing, but rather were told thereafter by government agents where the southwest boundary lay.  This misinformation communicated to two tribal members neither of whom were binding representatives of the Nation, skewed the analysis and oral history from the beginning, until the Treaty Map was recovered in 1930.  By beginning with a faulty foundation, Mr. Reis' conclusion and later historical analysis are wrong.

68.     Mr. Reis opined that the correct boundary is the Barnard Line, but Barnard's survey is comprised of straight lines—in complete derogation of the calls of the Treaty to follow natural and monumental boundaries.  Mr. Reis' opinion on this point is rejected.

69.     Another instance of misinterpretation is Mr. Reis' emphasis on the placement of the 46th parallel on the Treaty Map with the boundaries of the Reservation shown well north of this line.  First, he has improperly ignored that

there is no evidence that the Indians understood latitude and longitude or that it was explained to them. Next, Grayback Mountain lies within the Reservation and that mountain sits south of the 46th parallel. Mr. Reis had no explanation for that mistake on the Treaty Map, yet he places great emphasis on the fact that Camas Prairie is south of the 46th parallel and therefore, in his opinion it could not have been intended to be within the Reservation. On the one hand Mr. Reis ignores a blatant mistake and on the other hand he relies on a defective feature of the map to exclude Tract D from the Reservation. These inconsistent positions cannot be explained, justified nor accepted by the Court.

70.     Mr. Reis placed particular emphasis on the railroad maps prepared at Governor Stevens' direction, but not shown to the Indians. Mr. Reis claimed these maps showed that Governor Stevens knew the topography and features surrounding Tract D and he did not include Tract D within the reservation's boundaries. There is no evidence that the railroad maps were shown to the Yakama Indians at the Walla Walla Treaty council, thus, the Indians did not agree upon them. The Court finds it significant that the White Swan Map later prepared by or at the direction of Governor Stevens is severely erroneous, despite that Governor Stevens had access to the railroad maps. The perspective and scale of the Treaty Map and White Swan Map are also severely distorted. *See N. Pac. Ry.*

*Co. v. United States*, 227 U.S. 355 (1913) ("The Stevens map, though vouched for by him to be accurate, has many inaccuracies . . . and adds to the confusion . . .").

71.    Defendants argued that Governor Stevens knew where Camas Prairie was located and did not include that in the Treaty Map.  The same can be said that he did not know where Camas Prairie was because it is not labeled on the Treaty Map nor the White Swan map.  If Governor Stevens knew where Camas Prairie was, why did he not label it and negotiate that monumental feature with the Indians, either inside or outside the reservation?  Without a discussion at the Walla Walla council—a meeting of the minds—whether Governor Stevens knew of Camas Prairie from subordinates performing the railroad surveys is immaterial to what the parties agreed in the wording of the Treaty and what was shown on the Treaty Map.

72.    It must also be noted that at the Walla Walla Treaty Council Governor Stevens said, ". . . here is the paper for the Yakamas. . . your lands are described. We got the descriptions from yourselfs (sic).  Then your reservations are pointed out, those you all know."  Ex. 32 at 100.  The Treaty Map depicts the Yakama Reservation's western boundary as passing along the main ridge of the Cascade Mountains in a southerly direction west of Mount Adams, and then south of Mount Adams for a distance before turning east along the Yakama Reservation's southern

border.  Ex. 55.  Governor Stevens was not giving the Yakama Nation a

reservation, the Yakama Nation was reserving these lands for themselves.

73.    Mr. Reis' opinion that the boundary should proceed from Goat Butte

to Grayback Mountain, which lie north and east of Mount Adams, is thus

categorically wrong.

74.    Mr. Reis viewed certain historical facts and statements without

understanding or taking into consideration the political climate and motivation of

those speakers and actors.  For instance, the Dawes Act did not benefit the Indians;

rather, it was designed to take property away from them in order to diminish their

land and sovereignty, absorbing them into the non-Indian culture.  Later, in the

1930s, Congress took the view of supporting the Indian culture and the

independent sovereignty of the Indians and the 1934 Indian Reorganization Act

(known as the Wheeler-Howard Law) prohibited any further land allotment.  By

failing to recognize and appreciate the waxing and waning political climate and

motivations of various actors, Mr. Reis came to an unsupportable and incorrect

opinion.

### RETROCESSION OF PUB. L. 83-280 JURISDICTION

The second issue presented in this case is the scope of state law jurisdiction

within the Yakama Reservation.  Jurisdiction over the Yakama Reservation, as

with all Indian Country, rests with federal and Yakama authorities "except where

Congress in the exercise of its plenary and exclusive power over Indian affairs has expressly provided that State laws shall apply." *Washington v. Confed. Bands and Tribes of the Yakima Indian Nation*, 439 U.S. 463, 470-71 (1979).

In 1953, concerned with "the absence of adequate tribal institutions for law enforcement" on "certain Indian reservations," Congress enacted Public Law 280, which required some states and authorized others to assume criminal and civil jurisdiction in Indian Country within a state's borders. *See Bryan v. Itasca Cty., Minn.*, 426 U.S. 373, 379 (1976)); Pub. L. 83-280, 67 Stat. 588, 588-89 (1953). In 1957, Washington enacted a law establishing state jurisdiction over any Indian reservation for any tribe that requested the State's assumption of jurisdiction. *Confed. Bands*, 439 U.S. at 474.

In 1963, Washington passed legislation allowing the State to assume civil and criminal jurisdiction pursuant to Public Law 280 over "Indians and Indian territory, reservations, country, and lands within this state," with certain limited exceptions. *See* RCW 37.12.010. Specifically, Washington did not assume jurisdiction over lands held in trust by the United States or held by a tribe in restricted fee status, unless the tribe consented, except in the following eight areas: (1) compulsory school attendance; (2) public assistance; (3) domestic relations; (4) mental illness; (5) juvenile delinquency; (6) adoption proceedings; (7) dependent children; and (8) operations of motor vehicles on public roads. *See* RCW

37.12.010.  The Yakama Nation did not agree to the law and unsuccessfully challenged it in the United States Supreme Court.  *Washington v. Confed. Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463 (1979).

In 1968, Congress amended Public Law 280 and repealed the option for states to assume jurisdiction over Indian Country without tribal consent, making tribal consent a prerequisite for any state assuming jurisdiction over Indian Country.  25 U.S.C. § 1322(a).  For Washington and other states that had already assumed jurisdiction, Congress authorized the United States to "accept a retrocession by any State of all or any measure of the criminal or civil jurisdiction, or both, acquired by such State pursuant to the provisions of [Public Law 280] as it was in effect prior to [the 1968 amendments]."  25 U.S.C. § 1323(a).  The President delegated the authority to accept retrocessions to the Secretary of the Interior, in consultation with the Attorney General.  *See* Exec. Order No. 11435 (Nov. 21, 1968), 33 Fed. Reg. 17339-01 (Nov. 23, 1968).

In 2012, the Washington State Legislature adopted a law codifying the process by which the State could retrocede its Public Law 280 jurisdiction to the United States.  *See* RCW 37.12.160.  The Yakama Nation filed a petition with the Office of the Governor on July 17, 2012, asking the State to retrocede its civil and criminal jurisdiction over "all Yakama Nation Indian Country" and in five areas listed in RCW 37.12.010.

On January 17, 2014, Washington State Governor Jay Inslee issued

Proclamation by the Governor 14-01 ("Proclamation 14-01") partially retroceding

the State of Washington's jurisdiction over the Yakama Reservation back to the

United States. Ex. 102. Three provisions of that Proclamation are relevant to the

dispute now before the Court. First, the State of Washington retroceded to the

United States "full civil and criminal jurisdiction" in four areas of law:

Compulsory School Attendance; Public Assistance; Domestic Relations; and

Juvenile Delinquency. *Id.* at 2, ¶ 1. Second, the State of Washington retroceded

"in part, civil and criminal jurisdiction in Operation of Motor Vehicles on Public

Streets, Alleys, Roads, and Highways cases in the following manner: Pursuant to

RCW 37.12.010(8), the State shall retain jurisdiction over civil causes of action

involving non-Indian plaintiffs, non-Indian defendants, and non-Indian victims; the

State shall retain jurisdiction over criminal offenses involving non-Indian

defendants and non-Indian victims." *Id.* at 2, ¶ 2. Third, the State of Washington

specified that the State would "retrocede, in part, criminal jurisdiction over certain

criminal offenses," and "retain[] jurisdiction over criminal offenses involving *non-*

*Indian defendants and non-Indian victims*." *Id.* at 2, ¶ 3 (emphasis added). In a

letter transmitting the proclamation to the Department of the Interior ("DOI") on

January 27, 2014, Governor Inslee explained that the State's retrocession of

criminal jurisdiction was intended to retain jurisdiction whenever "non-Indian defendants *and/or* non-Indian victims" were involved. Ex. 103.

On October 19, 2015, DOI notified the Yakama Nation of the United States' acceptance of "partial civil and criminal jurisdiction over the Yakama Nation." Ex. 104. Regarding the "extent of retrocession," DOI stated that Governor Inslee's proclamation was "plain on its face and unambiguous." *Id*. at 4. Noting its concern that "unnecessary interpretation might simply cause confusion," DOI explained that "[i]f a disagreement develops as to the scope of the retrocession, we are confident that courts will provide a definitive interpretation of this plain language of the Proclamation." *Id*. Pursuant to the DOI's instructions, the United States formally implemented retrocession on April 19, 2016, following significant coordination between the Yakama Nation, the United States, the State of Washington, and local jurisdictions. *See* Ex. 106.

Plaintiff asserts that, following the United States' acceptance of partial retrocession of jurisdiction within the Yakama Reservation, "Klickitat County may no longer exercise any criminal jurisdiction over a minor Yakama Member for alleged crimes committed on the Yakama Reservation; that jurisdiction lies with the Yakama Nation and/or the United States." ECF No. 1 at 7, ¶ 5.14. Plaintiff goes further and maintains that "Klickitat County does not have the authority or jurisdiction to arrest, detain, charge, prosecute, convict, or sentence Yakama

Members for alleged crimes occurring within Indian Country as defined by 18 U.S.C. 1151, including by definition all land within the exterior boundaries of the Yakama Reservation."

On September 27, 2017, Klickitat County arrested PTS, an enrolled Yakama member and minor, detained PTS at the Northern Oregon Regional Correctional Facility, and charged PTS with two counts of statutory rape. *Id.* at ¶ 5.16. Plaintiff asserts that the alleged crimes occurred within the exterior boundaries of the Yakama Reservation near Glenwood, within Tract D. *Id.* at ¶ 5.17. Plaintiff argues that Defendants have acted unlawfully by arresting, detaining, charging, prosecuting, and convicting PTS. *Id.* at ¶ 5.18; *see* Ex. 574.

More recently, on October 13, 2018, Plaintiff complains of an arrest of Yakama member Robert Libby within the city of Glenwood, in Tract D. Mr. Libby was arrested and charged with various firearms related crimes and traffic offenses by Klickitat County. *See* ECF No. 36 at 24-25.

Defendants confirm that they exercised criminal jurisdiction over Yakama members within Tract D and do not deny their intent to continue exercising criminal jurisdiction within Tract D because they contend it is not within the Yakama Reservation.

The Court viewed the plain language of Governor Inslee's retrocession proclamation, DOI's acceptance of retrocession, and federal and state law

governing the retrocession process as properly establishing the limitations of the

States' retrocession. The State of Washington retroceded to the United States "full

civil and criminal jurisdiction" in four areas of law: Compulsory School

Attendance; Public Assistance; Domestic Relations; and Juvenile Delinquency.

Accordingly, since Tract D is within the Yakama Reservation, acts of

Juvenile Delinquency committed by Indians, like PTS, are governed by federal and

tribal law, not state law. The Court does not vacate PTS's conviction however as

this Court does not have jurisdiction, in this proceeding, to grant that form of relief.

Furthermore, the Court understands that PTS did not claim or prove his Indian

status as a jurisdictional defense to those charges.

The State of Washington retroceded "in part, civil and criminal jurisdiction

in Operation of Motor Vehicles on Public Streets, Alleys, Roads, and Highways

cases in the following manner: Pursuant to RCW 37.12.010(8), the State shall

retain jurisdiction over civil causes of action involving non-Indian plaintiffs, non-

Indian defendants, and non-Indian victims; the State shall retain jurisdiction over

criminal offenses involving non-Indian defendants and non-Indian victims." Ex.

102 at 2, ¶ 2. Traffic offenses committed by Indians, like Robert Libby, are

governed by federal and tribal law, not state law. The Court does not vacate

Robert Libby's convictions, if any, as this Court does not have jurisdiction, in this

proceeding, to grant that form of relief. Furthermore, the Court understands that

Robert Libby has not claimed or proven his Indian status as a jurisdictional defense to those charges.

Finally, the Court concludes that Plaintiff's interpretation of the extent of retrocession for other crimes is too expansive. Reading the plain language of the Governor's use of the sentence "The State retains jurisdiction over criminal offenses involving non-Indian defendants and non-Indian victims" in context, both historical and in the context of the entire retrocession proclamation, makes clear that the State retained jurisdiction in two areas—over criminal offenses involving non-Indian defendants and over criminal offenses involving non-Indian victims. Accordingly, the State and necessarily the Defendants here have criminal jurisdiction over offenses committed by or against non-Indians within the Yakama Reservation.

Consistent with this Court's prior ruling in *Confed. Tribes v. City of Toppenish*, 1:18-CV-03190-TOR, ECF No. 28 (Feb. 22, 2019), the Court rejects Plaintiff's argument that Defendants no longer have criminal jurisdiction over Indians within the Yakama Reservation following retrocession. In order to explain the Court's reasoning and for completeness, it is necessary to repeat the court's analysis of the various arguments made there and here. *See* ECF No. 36, Yakama Nation's Motion for Preliminary Injunction.

Plaintiff contends that the State retroceded criminal jurisdiction "over all crimes within the Yakama Reservation where an Indian is involved *as a defendant and/or victim*." (emphasis added). Accordingly, Plaintiff insists that Defendants are violating the Yakama Nation's treaty rights and threatening its sovereignty by exercising criminal jurisdiction over enrolled Yakama members within the Yakama Reservation. Defendants maintain that, while the State retroceded some criminal jurisdiction to the United States, the State retained jurisdiction over criminal offenses involving non-Indian defendants *and/or* non-Indian victims within the Yakama Reservation.

Plaintiff provides four reasons why the United States reassumed "the full scope of Public Law 280 criminal jurisdiction" from the State of Washington: (1) in accepting retrocession, DOI interpreted the Governor's proclamation as retroceding all criminal jurisdiction over offenses whenever a Yakama member is involved as either a defendant and/or victim; (2) DOI's acceptance of retrocession should be afforded judicial deference; (3) the United States Office of Legal Counsel's recent memorandum opinion should be afforded no deference; and (4) Washington's attempt to claw back jurisdiction it clearly retroceded is not supported by applicable law.

In the Court's view, Plaintiff's arguments hinge entirely on the underlying assumption that DOI, in accepting retrocession, definitively identified the scope of

the State's retrocession as (1) retroceding federal jurisdiction over all offenses occurring within the Yakama Reservation whenever an Indian is involved as a defendant and/or victim and (2) retaining criminal jurisdiction only over criminal offenses involving both a non-Indian defendant and non-Indian victim, as well as non-Indian victimless crimes. Assuming this is DOI's interpretation, Plaintiff urges a "federal-focus perspective on interpreting retrocessions," arguing that "the Department of the Interior's actions are controlling, regardless of any other governments' and agencies' contrary interpretation." And, according to Plaintiff, applying the federal-focus perspective to DOI's actions in this case unambiguously support Plaintiff's interpretation of the scope of retrocession—i.e., retroceding criminal jurisdiction over all offenses where a Yakama member is involved.

Unlike the Plaintiff, the Court is not convinced that DOI, in accepting retrocession, necessarily understood the Governor's retrocession proclamation as an offer to retrocede criminal jurisdiction over all crimes within the Yakama Reservation whenever an Indian is involved "as a defendant and/or victim." The retrocession proclamation, paragraph 3 provides in relevant part:

> Within the exterior boundaries of the Yakama Reservation, the State shall retrocede, in part, criminal jurisdiction over certain criminal offenses not addressed by Paragraphs 1 and 2. The State retains jurisdiction over criminal offenses involving *non-Indian defendants and non-Indian victims*.

Ex. 102 (emphasis added). Thus, the State expressly retained jurisdiction over "all criminal offenses involving *non-Indian defendants and non-Indian victims*." As noted, in the letter transmitting the proclamation to DOI on January 27, 2014, Governor Inslee clarified that the State's intent in retroceding criminal jurisdiction was to retain jurisdiction whenever "non-Indian defendants *and/or* non-Indian victims" were involved. Ex. 103.

In DOI's October 19, 2015, letter notifying the Yakama Nation of retrocession, DOI confirmed that it had accepted the Governor's offer of retrocession and briefly addressed the "extent of retrocession" issue. Ex. 104 at 5. After confirming that "Washington law clearly sets forth the process for retrocession of civil or criminal jurisdiction in Washington State," DOI summarily concluded that the Governor's proclamation was "plain on its face and unambiguous." *Id*. However, DOI then continued:

> We worry that unnecessary interpretation might simply cause confusion. If a disagreement develops as to the scope of the retrocession, we are confident that courts will provide a definitive interpretation of the plain language of the Proclamation. In sum, it is the content of the Proclamation that we hereby accept in approving retrocession.

*Id*.

Plaintiff maintains that DOI's interpretation of the proclamation as "plain on its face and unambiguous," and its characterization of any subsequent

interpretation as "unnecessary," amounts to an express rejection of Governor Inslee's subsequent clarification that the proclamation's intent was to retain state criminal jurisdiction over cases involving "non-Indian defendants *and/or* non-Indian victims." The Court, however, disagrees. Rather than weighing in on the issue, DOI expressly declined to delineate the scope of retrocession, instead leaving it for the courts to "provide a definitive interpretation of the plain language of the Proclamation." *Id.*

Informative and not necessarily binding on this Court, a Washington court has now provided a definitive interpretation of the plain language of the Governor's retrocession proclamation and, in doing so, has clarified the scope of Washington's criminal jurisdiction within exterior boundaries of the Yakama Reservation following retrocession. *See State v. Zack*, 2 Wash. App. 2d 667, *review denied*, 191 Wash. 2d 1011 (2018). In *State v. Zack*, Division Three of the Washington Court of Appeals considered a jurisdictional challenge to the scope of the State's post-retrocession criminal jurisdiction within the Yakama Reservation, almost identical to Plaintiff's challenge here. The *Zack* court determined that "[t]he jurisdiction issue turns on the meaning of the Governor's proclamation, with the dispositive question being the meaning of the word 'and.'" *Id*. at 672. The *Zack* court is the only court, state or federal, to consider whether the Governor's

use of the word "and" in the contested retrocession provision should be read in the conjunctive or disjunctive.

Performing a plain language analysis, the *Zack* court concluded that the word "and" should be read in the disjunctive—i.e., "non-Indian defendant *and/or* non-Indian victim"—because the conjunctive interpretation "would render the proclamation internally inconsistent and nonsensical." *Id*. As the court explained, appellant's proposed construction, and the one advanced by Plaintiff in this case, "would mean that the only type of case the State could prosecute would require the involvement of non-Indian defendants who victimized other non-Indians on fee land." *Id*. at 675. However, because "[t]he State already had authority to prosecute non-Indians for offenses committed on deeded lands prior to the enactment of Public Law 280," and the Governor was only authorized to retrocede jurisdiction acquired under Public Law 280, the *Zack* court concluded that the conjunctive construction "would result in the Governor engaging in *ultra vires* action." *Id*. at 675-76 ("Asserting or removing state jurisdiction over non-Indians is not within the scope of Public Law 280 or RCW 37.12.010.). The *Zack* court further observed that excluding Indians from prosecution in all cases "would mean that the Governor intended to return all of the criminal jurisdiction the State assumed by RCW 37.12.010 and the word 'in part' would be rendered meaningless because there would have been total rather than partial retrocession." *Id*. at 675.

For these reasons, the court held that "the State retained jurisdiction to prosecute this assault against a non-Indian occurring on deeded land within the boundaries of the Yakama reservation." *Id*. at 676.

Though the Court is not bound by the decision, the Court finds the *Zack* court's analysis and holding persuasive, particularly when considering the historical patchwork of federal, state, and tribal criminal jurisdiction on the Yakama Reservation. Before the enactment of Public Law 280 or RCW 37.12.010, "the Yakima Nation was subject to the general jurisdictional principles that apply in Indian country in the absence of federal legislation to the contrary." *Confed. Bands*, 439 U.S. at 470. Under those principles, while Indian tribes generally retain criminal jurisdiction over Indians within Indian reservations, tribes have no "inherent jurisdiction to try and to punish non-Indians." *Id*.; *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 212 (1978). Thus, only the state possessed criminal jurisdiction over non-Indians who committed crimes against other non-Indians on Indian reservations. *See*, *e.g.*, *Draper v. United States*, 164 U.S. 240, 242-43 (1896); *United States v. McBratney*, 104 U.S. 621, 624 (1882). Victimless crimes committed by non-Indians in Indian country are also within the exclusive jurisdiction of the state. *See Solem v. Bartlett*, 465 U.S. 463, 465 n.2 (1984). Neither the federal government nor the Tribe have jurisdiction over these crimes.

Public Law 280 authorized the State of Washington to assume full or partial jurisdiction over criminal offenses and civil causes of action involving Indians in Indian Country within the State's borders. *Confed. Bands*, 439 U.S. at 471-72. In 1963, the State opted to assume some jurisdiction under Public Law 280. *See* RCW 37.12.010. As the Supreme Court explained, "[f]ull criminal and civil jurisdiction to the extent permitted by Pub. L. 280 was extended to all fee lands in every Indian reservation and to trust and allotted lands therein when non-Indians were involved." *Confed. Bands*, 439 U.S. at 475. However, "state jurisdiction was not extended to Indians on allotted and trust lands unless the affected tribe so requested," except for those eight areas of law specified in RCW 37.12.010(1)-(8). *Id*.

When Congress amended Public Law 280 in 1968, it authorized the United States to "accept a retrocession by any State of all or any measure of the criminal or civil jurisdiction" previously acquired pursuant to Public Law 280. 25 U.S.C. § 1323(a). By Executive Order, the Secretary of the Interior was then empowered to accept "*all or any measure*" of a state's offer of retrocession. *See* Exec. Order No. 11435 (Nov. 21, 1968), 33 Fed. Reg. 17339-01 (Nov. 23, 1968) (emphasis added). However, neither § 1323 nor the Executive Order authorize the Secretary to accept *more* jurisdiction than a state initially acquired under Public Law 280. Under

federal law, a state may only retrocede any measure of jurisdiction "acquired by such State pursuant to [Public Law 280]." 25 U.S.C. § 1323(a).

The State of Washington's statute outlining the retrocession process, RCW 37.12.160(1), confirms that the State may only "retrocede to the United States all or part of the civil and/or criminal jurisdiction previously acquired by the state over a federally recognized Indian tribe, and the Indian country of such tribe." Particularly relevant here, the statute specifically defines "criminal retrocession" as "the state's act of returning to the federal government the criminal jurisdiction acquired over Indians and Indian country under federal Public Law 280." RCW 37.12.160(9)(b).

Plaintiff urges the Court to interpret the Governor's retrocession proclamation, and DOI's acceptance of retrocession, as retroceding all criminal jurisdiction over crimes committed within the Yakama Reservation, including land held in fee by Indian and non-Indian owners, whenever an Indian is involved as a defendant and/or victim. Stated differently, Plaintiff maintains that "[t]he only criminal offenses over which the State retained jurisdiction are those involving both a non-Indian defendant and non-Indian victim, as well as non-Indian victimless crimes." Plaintiff claims that DOI's acceptance of retrocession "does not leave open the possibility of the State continuing to play a role in Indian-involved crimes within the Yakama Reservation."

However, interpreting the Governor's retrocession proclamation as Plaintiff insists "would result in the Governor engaging in an *ultra vires* action," as the offer of retrocession would be *returning* more jurisdiction to the United States than the State assumed under Public Law 280 and RCW 37.12.010.  *Zack*, 2 Wash. App. 2d at 676.  As noted, the State's authority to prosecute non-Indians for crimes committed against non-Indians on the Yakama Reservation preexists Public Law 280 or RCW 37.12.010.  Under Plaintiff's interpretation, the State would be "retaining" jurisdiction that it simply did not acquire from the United States pursuant to Public Law 280.  The Court accepts the *Zack* court's logical interpretation, which is consistent with Public Law 280 and RCW 37.12.160's instructions.

Reading the Governor's use of the sentence "The State retains jurisdiction over criminal offenses involving non-Indian defendants and non-Indian victims." in context, both historical and in the context of the entire retrocession proclamation, also makes it plain that the State was retaining jurisdiction in two areas—over criminal offenses involving non-Indian defendants and over criminal offenses involving non-Indian victims.  The plain reading of the language thus also shows the limitation of the States' retrocession.

Moreover, Plaintiff's interpretation directly contradicts Governor Inslee's stated intent to "retrocede, *in part*, criminal jurisdiction."  (emphasis added).

Under Plaintiff's view of the scope of retrocession, the State retroceded all criminal jurisdiction assumed under Public Law 280, retaining only that jurisdiction that predated Public Law 280—*i.e.*, the "authority to punish offenses committed by her own citizens upon Indian reservations." *Draper v. United States*, 164 U.S. 250, 247 (1896). This interpretation is at odds with Governor Inslee's stated intent of retroceding some, but not all, criminal jurisdiction acquired under Public Law 280. The Court cannot reconcile Plaintiff's illogical interpretation of the scope of retrocession with the plain language of the Governor's retrocession proclamation, or federal and state law.

The Court concludes that the State retained jurisdiction over criminal offenses where the perpetrator or the victim is a non-Indian. This interpretation is consistent with the plain language of the Governor's retrocession proclamation, DOI's acceptance, and federal and state law governing the retrocession process. Accordingly, the Court finds that Defendants have criminal jurisdiction over offenses committed by or against non-Indians within the Yakama Reservation.

### INJUNCTION AND/OR DECLARATORY JUDGMENT

To obtain a permanent or final injunction, a "plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy

in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." e*Bay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Indep. Training & Apprenticeship Program v. California Dep't of Indus. Relations*, 730 F.3d 1024, 1032 (9th Cir. 2013). Plaintiff must satisfy each element for injunctive relief. The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion. e*Bay Inc.*, 547 U.S. at 391.

In 1934, Congress empowered the federal courts to grant a new remedy, the declaratory judgment. The purpose of the Federal Declaratory Judgment Act was to provide a milder alternative to the injunction remedy. *Steffel v. Thompson*, 415 U.S. 452, 467 (1974) (quoting *Peres v. Ledesma*, 401 U.S. 82, 111 (1971) (separate opinion of Brennan, J.)). "[A] federal district court has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction." *Id.* at 468 (quoting *Zwickler v. Koota*, 389 U.S. 241, 254 (1967)). Different considerations enter into a federal court's decision as to declaratory relief, on the one hand, and injunctive relief, on the other. *Steffel*, 415 U.S. at 469 (citations omitted). A declaratory judgment will have a "less intrusive effect on the administration of state criminal laws," "it is a much milder form of relief than an injunction," and noncompliance is not punishable by contempt. *See id.* at 469-71. A failure to

demonstrate irreparable injury does not preclude the granting of declaratory relief. *See id.* at 471-72. Thus, the Supreme Court held that, "regardless of whether injunctive relief may be appropriate, federal declaratory relief is not precluded when no state prosecution is pending and a federal plaintiff demonstrates a genuine threat of enforcement of a disputed state criminal statute . . ." *Id.* at 475.

In consideration of the fact that the two state prosecutions which help to predicate this Court's jurisdiction are final, and in consideration of the equities, the Court concludes that an injunction at this time is unnecessary, but rather a declaratory judgment will achieve the purposes of declaring the southwestern boundary of the Reservation and scope of applicable state laws.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. A Declaratory Judgment shall be entered declaring that: Tract D, as surveyed by Cadastral Engineer Ronald Scherler and approved by the United States in 1982, is located within the exterior boundaries of the Yakama Reservation established by the Treaty of 1855. The boundaries of the area of land referred to as Tract D are those surveyed by E.D. Calvin in 1932, and by Ronald Scherler in 1982, within which there are approximately 121,465.69 acres. Not all of Tract D falls within Klickitat County.

2. A Declaratory Judgment shall be entered declaring that since Tract D is within the Yakama Reservation and the State of Washington retroceded all jurisdiction concerning acts of Juvenile Delinquency committed therein by Indians, state juvenile delinquency law no longer applies to Indians within the Reservation, including Tract D.

3. A Declaratory Judgment shall be entered declaring that since Tract D is within the Yakama Reservation and the State of Washington retroceded "in part, civil and criminal jurisdiction in Operation of Motor Vehicles on Public Streets, Alleys, Roads, and Highways cases in the following manner: Pursuant to RCW 37.12.010(8), the State shall retain jurisdiction over civil causes of action involving non-Indian plaintiffs, non-Indian defendants, and non-Indian victims; the State shall retain jurisdiction over criminal offenses involving non-Indian defendants and non-Indian victims." Thus, traffic offenses committed by Indians are governed by federal and tribal law, not state law.

4. A Declaratory Judgment shall be entered declaring that since Tract D is within the Yakama Reservation and the State of Washington retroceded certain jurisdiction but retained jurisdiction in two areas—over criminal offenses involving non-Indian defendants and over criminal offenses involving non-Indian victims—accordingly, the State and necessarily the

Defendants here have criminal jurisdiction over offenses committed by or against non-Indians within the Yakama Reservation, including Tract D.

The District Court Executive is directed to enter this Order, enter Judgment accordingly, furnish copies to counsel, and close this case.

DATED August 28, 2019.



THOMAS O. RICE
Chief United States District Judge